[No. S088712. Aug. 15, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES EDWARD STORM, Defendant and Appellant.

1008

**Counsel**

David M. McKinney, under appointment by the Supreme Court, for Defendant and Appellant.

John T. Philipsborn and Charles D. Weisselberg for California Attorneys for Criminal Justice as Amicus Curiae on behalf of Defendant and Appellant.

Bill Lockyer, Attorneys General, David P. Druliner, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Sara

Gros-Cloren, William M. Wood and Holly D. Wilkens, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BAXTER, J.**—This case involves issues, previously unaddressed by this court, which arise under *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974] (*Miranda*) and its progeny. During an investigation of his wife's homicide, defendant agreed to take a polygraph test. At the police station, he received *Miranda* warnings and waived his rights, but then said he wished to consult a lawyer before speaking further. Rather than cease questioning immediately, as *Miranda* and *Edwards v. Arizona* (1981) 451 U.S. 477 [101 S.Ct. 1880, 68 L.Ed.2d 378] (*Edwards*) require in a custodial setting, the polygraph operator encouraged defendant to keep talking. During this interlude, defendant admitted he killed his wife, claiming an assisted suicide.

Defendant was allowed to leave the station. Two days later, detectives came to his home. After assuring him he would not then be arrested, they interviewed him again without new *Miranda* warnings. Defendant provided a more detailed version of his assisted-suicide story. The detectives then departed as they had promised.

Defendant was charged with premeditated murder. The trial court excluded all his station house statements made after he first requested counsel, but it admitted the later home interview. Defendant took the stand. Contrary to his prior claims, he testified that he "snapped" and killed his wife when, during an argument, she disparaged his sexual performance.

Defendant was convicted as charged. On appeal, he asserted that admission of the home interview was prejudicial error. He argued that the police violated *Edwards* by recontacting him for questioning after he had invoked his *Miranda* right to counsel in custody. He insisted that any "break in custody" exception to the *Edwards* no-recontact rule was inapplicable in this case, because the police released him from custody on a mere "pretext" to avoid *Edwards*, and because they failed to give new *Miranda* warnings before requestioning him at home. The Court of Appeal rejected these arguments and affirmed the conviction.

We agree with the Court of Appeal that the break-in-custody exception to the *Edwards* no-recontact rule governs here. The special protections of *Miranda* and *Edwards* apply only to persons questioned in the coercive

atmosphere of *police custody*. The *Edwards* no-recontact rule guards against police badgering designed to wear down a suspect who *remains in custody* after invoking his *Miranda* right to counsel during custodial questioning.

Insofar as defendant's first statement was obtained in violation of *Edwards*, it was inadmissible in the prosecution's case-in-chief. But when the police realized their mistake, they released him, and they recontacted him only after a two-day interval during which he had ample time, opportunity, and incentive to consult counsel outside the coercive atmosphere of custody. Many cases recognize that such a break in custody vitiates the particular danger addressed by *Edwards*, and new police questioning is permitted. Moreover, defendant was not rearrested before requestioning, but was re-interviewed, with his permission, in the noncustodial setting of his own home. Hence, no new *Miranda* warnings and waivers were required.

We also agree with the Court of Appeal that by releasing and later reapproaching defendant, the police were not engaged in an improper ruse or pretext to avoid the strictures of *Miranda* and *Edwards*. Accordingly, we need not decide whether the Court of Appeal was correct insofar as it suggested that the existence of such deliberate police misconduct would be irrelevant in any event.

Finally, we reject defendant's argument that the home interview was the *tainted product* of an earlier *Edwards* violation at the police station. Even if defendant's statements at the police station were elicited in violation of *Edwards*, there was no actual police coercion, and the record amply demonstrates that defendant spoke of his own free will. The two-day interval between interviews, during which defendant was free from custody, served to further attenuate any taint. The statement obtained at defendant's residence was itself entirely voluntary. As before, no coercive tactics were used. The evidence belies any inference that defendant's primary motive for talking was a realization that the "cat" was already "out of the bag." Finally, because the home interview occurred in a noncustodial setting to which *Miranda* protections do not apply, new *Miranda* warnings were not required to dissipate the taint from any prior *Edwards* violation.

Accordingly, we will affirm the Court of Appeal's judgment.

FACTS

*Charges and trial evidence.*

An information charged defendant with the premeditated murder of Gloria Andrade. (Pen. Code, §§ 187, subd. (a), 189.)[1] The information further alleged, for purposes of sentence enhancement, that defendant had personally used a deadly and dangerous weapon, a knife (§ 12022, subd. (b)(1)), and that he had previously been convicted of a forcible lewd act upon a child (§ 288, former subd. (b) (now subd. (b)(1)), a serious felony (§§ 667, subds. (a)-(i), 1192.7, subd. (c)). The trial evidence indicated the following:

On November 2, 1996, around 7:00 a.m., the body of Andrade, defendant's wife, was found in the brush beside a roadside turnout near Julian, in rural San Diego County. The body exhibited multiple stab wounds to the throat, chest, and back. Around 10:00 p.m. that evening, defendant telephoned the San Diego Police and reported Andrade missing.

On November 4, 1996, San Diego County Sheriff's homicide detectives Rowe and Heilig went to defendant's apartment to interview him about the report. Defendant stated he last saw Andrade around 9:00 p.m. on November 1, 1996, awoke the next morning to find her gone, made inquiries to try to find her, and then contacted the police. The detectives noticed personal effects on the dining room table; defendant confirmed they were Andrade's driver's license and rings. He claimed she had left them behind.

On November 21, 1996, after Andrade's body had been identified, Detectives Rowe, Moreno, and Jopes returned to defendant's home to interview him about her death. The jury heard a redacted audio recording of this interview, in which defendant claimed he helped Andrade to commit suicide.

Defendant's November 21 statement was as follows: He met Andrade while both were living in a recovery hotel for people with drug and alcohol problems. They later married, and he tried to give her the will to live, but she could not control her drinking and fell into a deep depression. In the weeks before her death, she frequently asked him to help her commit suicide. For a time, defendant resisted, and he finally told her it would have to be on the spur of the moment, because he could not think about it in advance. On the evening of November 1, 1996, she announced the time had come. He grabbed a knife from a kitchen drawer, and they departed in her car. After driving around in search of an isolated site, they arrived at the turnout near Julian. There he inflicted the knife wounds that caused her death.

As related by defendant on November 21, the sequence of wounds is somewhat unclear. However, defendant appears to have said that as he and Andrade exchanged a final kiss at her request, he sliced her throat. She

---

[1] All unlabeled statutory references are to this code.

smiled and guided the knife as he did so. Then he stabbed her in the chest as she sighed in relief. Finally, to make sure she was dead, he rolled her over and inflicted the wound in her back.

Defendant said he moved Andrade's body to where it was found because "I knew eventually things would come up," and "I figured . . . if she was found within three to five days I might have a better chance of them not findin' anything." Defendant brought home the knife, the gloves Andrade had been wearing, her jewelry, and, by mistake, her identification, but he "knew" he might have left behind such traceable evidence as hair samples, fingerprints, and cigarette butts.

Defendant declared he had "told [Andrade] . . . over and over, there's no way I'm gonna get away with this." Indeed, defendant said, though he attempted the missing person coverup, he "had no intent of really ever gettin' away with it. . . . I, I made a, made an effort but I, I r—, I absolutely *when the first night you* [i.e., the detectives] *were here . . . ,* [2] *I knew, I knew it was over.*" (Italics added.) Defendant insisted that now "my only thing is you know tellin' you the absolute truth and tryin' to convince you. *I really felt obligated.*" (Italics added.)

An autopsy suggested that the order of wounds was different than defendant had indicated in his November 21 statement. Based on the medical evidence, the pathologist opined that Andrade was stabbed in the back before she was stabbed in the chest, and that the nonfatal throat wounds were inflicted near the time of death, after the wound to her heart. Of the 12 knives consensually seized from defendant's apartment on November 21, the knife most consistent with Andrade's wounds was the one defendant had indicated to Detective Rowe.

The prosecution presented evidence that on November 1, 1996, the day Andrade was killed, she was offered a bookkeeping job. She was scheduled to begin on November 5, 1996, and was happy about starting work.

Defendant took the stand and admitted he killed Andrade, but he no longer claimed assisted suicide. He gave the following account: He and Andrade

---

[2]In the *unredacted* version of the November 21 interview, defendant referred at this point to a request by officers, made on November 4, 1996, that he take a polygraph examination. As is discussed in greater detail below, during defendant's first police interview on November 4, 1996, Detective Heilig had asked if defendant would take a polygraph examination, and defendant had agreed. On November 19, 1996, defendant came to the police station, received *Miranda* warnings, waived his *Miranda* rights, and submitted to a polygraph test, in which he denied involvement in his wife's death. At a later point in the November 19 interview, after being told he had failed the test, defendant invoked his *Miranda* right to counsel. All statements he thereafter made on November 19 were excluded from evidence.

had a volatile relationship; they argued about money, her drinking problem, and their sex life. Andrade was drinking wine heavily during October 1996, and she had bathed only once in the three weeks before her death. However, she had many reasons to live and was pleased about her new job. On November 1, 1996, they decided to celebrate with a nighttime picnic. They departed around 10:00 p.m.; Andrade left her jewelry and identification at home. After arriving at the turnout near Julian, they stargazed and picnicked happily for two hours, but then began to argue. After about 15 minutes, as defendant was packing the food and utensils, Andrade hurled the "final insult," screaming that defendant was "no good in bed." Defendant, who had a kitchen knife in his hand, "snapped" and "just lost it." He first grabbed Andrade by the collar and stabbed her in the back. As she struggled to push him away, he stabbed her in the chest, and she collapsed. Then he stood over her and began slashing her throat in a "frenzy." From beginning to end, the process may have taken a couple of minutes. Defendant did not intend to kill, but "was just lashing out with full anger." He dragged Andrade's body down the embankment, put the knife in the picnic basket, and departed.

In rebuttal, the prosecution offered evidence that the autopsy showed no food in Andrade's stomach; that the clothing on her body was not suitable for a nighttime outing in cool weather; that she was unlikely to leave her identification and jewelry at home; that she was happy with her marriage and sex life but recently believed defendant was losing interest in her; and that defendant had been violent in his relationship with a former wife.

The jury found defendant guilty of premeditated murder and found the knife-use allegation true. Defendant admitted the prior felony conviction.

The court sentenced defendant to 25 years to life for the murder, doubled under the "Three Strikes" law in consequence of the prior forcible lewd conduct conviction. The court imposed an additional consecutive one-year enhancement for the use of a knife, and an additional consecutive five-year serious felony enhancement for the prior forcible lewd conduct conviction.

*Suppression issues:*

On November 19, 1996, two days before the November 21, 1996, police interview at defendant's home, he was interviewed at a police station. Before trial, he moved to suppress (a) certain portions of the November 19 interview and (b) the entire November 21 interview. At the suppression hearing, the following evidence was adduced:

On November 4, 1996, while investigating defendant's missing person report, Detective Heilig asked if defendant was willing to take a polygraph

test, and he agreed. On November 19, 1996, the date scheduled for the examination, defendant drove himself to the police station. According to Detective Rowe, defendant looked like he had not slept much and seemed "a little bit stressed," but he did not appear nervous or uneasy about taking the test. Rowe administered a *Miranda* advisement, standard procedure for polygraph examinations. The subsequent interview was videotaped, and Rowe monitored it from an adjacent room.

In the examination room, polygraph examiner Redden readvised defendant of his *Miranda* rights; defendant said he understood and waived these rights. Redden then chatted at length with defendant about defendant's background, the case, and the test methodology. During this conversation, defendant reiterated his claim that he had awakened on the morning of November 2, 1996, to find Andrade missing, and he insisted he had no idea who was responsible for killing her.

Redden then administered the examination. While connected to the machine, defendant again denied involvement in Andrade's death. During the test, defendant mentioned, as he had earlier in the interview, that he felt tired from lack of sleep. However, he did not request cessation of the test.

When the test was over, Redden invited defendant to view the computer results. Redden said these indicated a "greater than ninety-nine percent" probability that defendant was lying about his role in Andrade's death. Redden suggested they should "chat" and "try [to] figure out what happened," because defendant would have to face the truth at some point.

Defendant agreed, then stated, "I wanna help you guys close your case but um, uh, I better talk to an attorney first. Seriously. Yo——, you can understand that." Redden said he "[could] understand that," whereupon defendant interjected, "I'd like to say somethin' off the record but I know that's impossible right now."

When Redden suggested that defendant talk for his own comfort, defendant blurted, "She begged me to." Redden asked, "Why is that," and defendant responded that Andrade "was tired [of] this world."

Thereafter, sometimes interrupted by questions from Redden, defendant explained that Andrade, plagued by chronic depression, nightmares, and alcoholism, had "giv[en] up" and lost the will to live, and had been "askin' me, beggin' me for two or three weeks. Everyday, everyday, everyday." Defendant suggested that "any of these people [apparently Andrade's friends and acquaintances] will tell you the same thing, *but it would kill them if they*

*knew I did it. And I'm not sayin' I did it until I've had a chance to talk to somebody.*" (Italics added.) When Redden further encouraged defendant to get it off his chest, defendant replied, "I, I honestly can't, I can't. You know, *I [jeopardized] myself* . . . . [¶] *I've said too much already.*" (Italics added.)

Redden responded that he was willing to listen. Defendant then launched into a rambling and emotional tirade, declaring, "God, I wouldn't wanna do this again. She said make sure that it's finished, don't look back, make it as quick as possible. . . . And [she said] don't ever tell anybody, [but] here I am telling. . . . [S]he was so scared that I was gonna get caught. . . . *I knew I couldn't lie.* I shoulda just refused to take this test, but how does that look. That's just as bad, right." (Italics added.) Redden agreed that such a refusal might arouse suspicion. Momentarily recovering himself, defendant then reminded Redden that "[l]ike I say[,] I'm not sayin' that I did it."

Redden asked what defendant *was* saying. Defendant answered by reciting a litany of troubles, including his prior prison term for molesting his daughter and his difficulties with his registration as a sex offender. Defendant indicated he had hoped for a fresh start somewhere else. But "[n]ow I'm stuck here. Now I'm gonna be here the rest [of] my life. I know it now. And I'm gonna die [in] prison" because the inmates would know he was a child molester.

Redden professed sympathy and said talking was the best way to deal with problems. Defendant responded, "Okay. But seriously[,] I think I shouldn't talk about it until I've consulted with somebody, you understand that." Redden said he did understand, but "if you wanted to talk, I was gonna sit here and listen." The following exchange then occurred: "[Defendant:] I told you, you know I want you guys to be able to close this case but God help me. God help me. Anything else that she would have wanted. Anything else I would've done it for her. But she begged me, she begged me, she begged me. [¶] [Redden:] What was she begging you to do? [¶] [Defendant:] To help her die. Help her die."

At Redden's prompting, defendant recounted various ways he and Andrade had discussed ending her life. Then defendant lamented, "Oh man. How could I do it." When Redden asked again what defendant and Andrade talked about doing, defendant responded, "Like, like I say, I better stop. I better stop. I, I've asked to talk to an attorney. I better stop. *I've already told you too much and it's on tape.*" (Italics added.)

When Redden said "Okay," defendant continued, "*You guys are gonna book me, you're gonna book me.* If you're gonna give me a chance to talk to

an attorney, you're gonna give me a chance to talk to an attorney." (Italics added.) Redden offered to go speak to "them" (apparently, to the detectives, in reference to defendant's request for counsel), but said that if defendant wanted to talk, Redden understood his position and was willing to listen.

Defendant asked that, "before deciding what to do," the authorities should check Andrade's body for signs of a struggle, though "*I know I'm gonna have to at least face the charges for assisted suicide, at the least. At the most I'm lookin' at homicide. I know that. I know that.*" (Italics added.) Defendant also urged that Detective Rowe talk to Andrade's acquaintances about her mental state.

At this point, Detective Rowe paged Redden because he was concerned about defendant's references to counsel and felt the interview should end. Redden left the examination room. Rowe entered and chatted briefly with defendant. Defendant said something that ended with "wanna talk to these people anymore." He requested a cup of coffee and mentioned again that he was "exhausted" because he had been up all night looking for a place to scatter Andrade's ashes. Rowe said he would check on the coffee, and defendant was momentarily left alone. He said, apparently to himself, "Fuck. Oh God. Shit. You did one . . . ."

Detective Moreno entered and asked defendant for his identification cards, including his driver's license. Defendant apparently handed these over, and Moreno departed.

Defendant then remained alone in the interview room for up to one hour. Meanwhile, Detective Rowe telephoned the district attorney's office for legal advice. Rowe eventually decided he would have to let defendant leave the station. No physical evidence linked defendant to the crime, and in light of defendant's references to counsel during the interview, Rowe doubted whether defendant's statements provided a basis for arresting him. Rowe concluded that the investigation should continue with the object of obtaining clearly admissible evidence, and that "it was going to be a couple of days before we [re]contacted [defendant]."

Rowe returned to the examination room and told defendant that although it appeared defendant wanted to say some things, he had requested counsel, so the police could not speak with him "right now." Accordingly, they were going to let him go home. Rowe gave defendant his pager number in case defendant wanted to talk further.

Defendant volunteered the names of people for Rowe to contact, and he promised to keep Rowe apprised of his whereabouts. The following colloquy

then occurred: "[Rowe:] 'Kay. *And don't think this is over with by any* . . . . [¶] [Defendant:] *I know* . . . . [¶] [Rowe:] *means*. [¶] [Defendant:] It's not. It ne——, it's not gonna be over until I'm laid to rest. [¶] [Rowe:] Okay. [W]ell uh, you know how [to] get a hold [of] me if you wanna talk so. [¶] [Defendant:] I really do . . . . [¶] [I] really wish I could so you could just close the case but it's not that simple you know, I, I know I'm not gonna get away clean, I wish I hadn't said anything. *But I can't live with the guilt either*." (Italics added.) Defendant then left the station. It is not clear whether his identification cards were returned.

Between November 19 and November 21, defendant was not placed under surveillance, and he was free to move about at will. The investigators recontacted him at home on the late afternoon of November 21. Defendant "invited [them] in"; whereupon Rowe explained that they wanted to hear "[his] side [of] the story," but that they would leave when the conversation was over, and defendant could go about his business. Rowe did not re-*Mirandize* defendant because the setting was noncustodial.

Though the officers left defendant's residence after speaking with him on November 21, Rowe admitted he intended to arrest defendant if he confessed to Andrade's murder during that interview. Defendant was immediately placed under surveillance. The next morning, the officers obtained a warrant, returned to defendant's apartment, and arrested him.

The trial court suppressed all statements made by defendant at the police station on November 19, 1996, after he first mentioned a desire to consult with counsel. However, the court ruled that the November 21, 1996, residential interview was fully admissible. The court reasoned as follows: Because defendant appeared voluntarily at the station and was free to leave at any time, the November 19 station house interview was not custodial, and *Miranda* rules were thus not technically applicable. Still, once defendant said he wanted to consult a lawyer, Redden's persistent and skillful questioning should not have occurred. However, because (1) the November 19 interview did not directly implicate *Miranda*, (2) defendant was free from custody between November 19 and November 21 in any event, and (3) the November 21 interview was itself noncustodial, the *Edwards* rule did not preclude the police recontact and did not require new *Miranda* warnings.

The Court of Appeal affirmed. It reasoned as follows: The November 19 station house interview was initially voluntary, but it became custodial once the polygraph operator accused defendant of lying about Andrade's death, thereby suggesting that defendant, who had already received *Miranda* warnings, was a suspect and was not free to leave. Hence, from that point

forward, defendant was entitled to *Miranda* protections, including the rule of *Edwards, supra,* 451 U.S. 477, that once a suspect under custodial interrogation requests counsel, questioning must cease and may not be reinitiated by the police so long as custody continues. Accordingly, all statements elicited by Redden on November 19 after defendant expressed the desire for counsel were properly excluded. But the *Edwards* no-recontact rule does not apply after a substantial intervening break in custody, however "pretextual." Thus, having released defendant on November 19, the police were not precluded from recontacting him on November 21. Moreover, because the November 21 interview was conducted at defendant's home, and the detectives fulfilled their promise that he was not under arrest, the interview was noncustodial, and no new *Miranda* warnings and waivers were required. Hence, all statements elicited from defendant on November 21 were admissible.

## DISCUSSION[3]

■ "The privilege against self-incrimination provided by the Fifth Amendment of the federal Constitution is protected in 'inherently coercive' circumstances by the requirement that a suspect not be subjected to *custodial* interrogation unless he or she knowingly and intelligently has waived the right to remain silent, to the presence of an attorney, and, if indigent, to appointed counsel. (*Miranda, supra,* 384 U.S. 436, 444-445 473-474 [86 S.Ct. 1602, 1612, 1613, 1627-1628]; see *Dickerson v. United States* [(2000)] 530 U.S. 428, 439-440 [120 S.Ct. 2326, 2333-2334, 147 L.Ed.2d 405] [(*Dickerson*)] . . . .) 'If a suspect indicates "in any manner and at any stage of the process," prior to or during questioning, that he or she wishes to consult with an attorney, the defendant may not be interrogated. (*Miranda* . . . , *supra,* . . . at pp. 444-445 . . . ; *id.,* at pp. 470, 472-474, 477-479 [citations].)' [Citation.]

■ "A suspect, having invoked these rights, is not subject to further interrogation by the police until counsel has been made available to him or her, unless the suspect personally 'initiates further communication, exchanges, or conversations' with the authorities. ([*Edwards, supra,*] 451 U.S. 477, 484-485 [101 S.Ct. 1880, 1884-1885 68 L.Ed.2d 378]. . . ; . . . see also *McNeil v. Wisconsin* (1991) 501 U.S. 171, 176-177 [111 S.Ct. 2204, 2207-2209, 115 L.Ed.2d 158] [(*McNeil*)]; *Arizona v. Roberson* (1988) 486 U.S. 675, 680-682 [108 S.Ct. 2093, 2097-2098, 100 L.Ed.2d 704].) If a suspect invokes these rights and the police, *in the absence of any break in*

---

[3]The California Attorneys for Criminal Justice has filed an amicus curiae brief in support of defendant. Except as otherwise indicated, amicus curiae makes arguments parallel to those advanced by defendant himself.

*custody*, initiate a meeting or conversation during which counsel is not present, the suspect's statements are presumed to have been made involuntarily and are inadmissible as substantive evidence at trial, even in the event the suspect executes a waiver and despite the circumstance that the statements would be considered voluntary under traditional standards. (*McNeil . . . , supra*, 501 U.S. at pp. 176-177 [111 S.Ct. at pp. 2207-2209].)" (*People v. Cunningham* (2001) 25 Cal.4th 926, 992-993 [108 Cal.Rptr.2d 291, 25 P.3d 519] (*Cunningham*), italics added.)[4]

As in the Court of Appeal, defendant argues that, because he invoked his *Miranda* right to counsel during a custodial interrogation on November 19, 1996, *Edwards* barred the police from recontacting him for questioning at his home on November 21. He urges that a break-in-custody exception to the *Edwards* rule is inappropriate. In particular, he contends, such an exception does not apply here because his release from custody was a mere pretext by the police to obtain admissible statements after a *Miranda* violation had already occurred, and because he received no new *Miranda* warnings before he was requestioned.

Finally, defendant insists, even if *Edwards* imposed no direct bar against the November 21 interview, the statements he made on November 21 were the tainted product of those illegally obtained from him on November 19 after he requested an attorney. Defendant urges there was no intervening independent event to dispel the presumption that the second statement was obtained by exploiting the prior illegality. He asserts the November 21 statement was not voluntary, because he realized he had already "let the cat out of the bag" on November 19, and was not knowing and intelligent, because he received no new *Miranda* warnings before being questioned on November 21.[5]

"In reviewing constitutional claims of this nature, it is well established that we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial

---

[4]"Following the adoption of article I, section 28, subdivision (d) of the California Constitution, we have applied federal standards in reviewing a defendant's claims that his or her statements were elicited in violation of *Miranda*. (*People v. Sims* [(1993)] 5 Cal.4th 405, 440 [20 Cal.Rptr.2d 537, 853 P.2d 992] [(*Sims*)].)" (*Cunningham, supra*, 25 Cal.4th 926, 993.)

[5]In this court, the People do not seriously renew their contentions, rejected below, that (1) *Edwards* is inapplicable to the November 19, 1996, station house interview because it was not custodial, and (2) defendant's request for counsel on November 19 was unclear. We therefore assume, as the Court of Appeal concluded, that on November 19, once defendant stated his desire to consult an attorney before speaking further, polygraph operator Redden's continued questioning, and defendant's statements thereby elicited, violated *Miranda* and *Edwards*. By the same token, defendant (though not amicus curiae) has conceded on appeal that the November 21 home interview was noncustodial.

evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained. [Citations.]" (*Cunningham, supra,* 25 Cal.4th 926, 992.) We address defendant's contentions accordingly.

### 1. *Break in custody.*

*Edwards, supra,* 451 U.S. 477, held that "when an accused has invoked his right to have counsel present during *custodial* interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated *custodial* interrogation even if he has been advised of his rights." (*Id.,* at p. 484 [101 S.Ct. at pp. 1884-1885], fn. omitted, italics added.) The United States Supreme Court has since described *Edwards* as providing that, once a suspect in custody invokes his *Miranda* right to counsel, his or her subsequent statements to police are presumed involuntary and inadmissible if obtained pursuant to an "encounter [initiated by the police] in the absence of counsel (*assuming there has been no break in custody*)." (*McNeil, supra,* 501 U.S. 171, 177 [111 S.Ct. 2004, 2208], italics added.)

While the high court has never directly addressed whether a break in custody vitiates the *Edwards* no-recontact rule, California cases uniformly have held or assumed that the rule barring police recontact after a *Miranda* request for counsel applies only during continuous custody. (*In re Bonnie H.* (1997) 56 Cal.App.4th 563, 579-585 [65 Cal.Rptr.2d 513] (*Bonnie H.*); *People v. Scaffidi* (1992) 11 Cal.App.4th 145, 152-153 [15 Cal.Rptr.2d 167] (*Scaffidi*); see *Cunningham, supra,* 25 Cal.4th 926, 992-993 [citing *McNeil*]; *People v. Crittenden* (1994) 9 Cal.4th 83, 128 [36 Cal.Rptr.2d 474, 885 P.2d 887] [citing *McNeil*].)[6] The instant Court of Appeal concurred in these decisions. ■ It held that "[w]hen there is a break in custody of a

---

[6]Other state and federal decisions consistently have reached the same conclusion. (E.g., *Kyger v. Carlton* (6th Cir. 1998) 146 F.3d 374, 380-381; *U.S. v. Bautista* (10th Cir. 1998) 145 F.3d 1140, 1150, cert. den. (1998) 525 U.S. 911 [119 S.Ct. 255, 142 L.Ed.2d 210]; *U.S. v. Barlow* (5th Cir. 1994) 41 F.3d 935, 945-946, cert. den. (1995) 514 U.S. 1030 [115 S.Ct. 1389, 131 L.Ed.2d 241]; *U.S. v. Hines* (9th Cir. 1992) 963 F.2d 255, 257; *Dunkins v. Thigpen* (11th Cir. 1988) 854 F.2d 394, 397-398, cert. den. (1989) 489 U.S. 1059 [109 S.Ct. 1329, 103 L.Ed.2d 597]; *McFadden v. Garraghty* (4th Cir. 1987) 820 F.2d 654, 661; *United States v. Skinner* (9th Cir. 1982) 667 F.2d 1306, 1309, cert. den. (1983) 463 U.S. 1229 [103 S.Ct. 3569, 77 L.Ed.2d 1410]; *People v. Trujillo* (Colo. 1989) 773 P.2d 1086, 1091-1092; *Gonzalez v. State* (Fla.Dist.Ct.App. 1984) 449 So.2d 882, 886; *Wilson v. State* (1994) 264 Ga. 287 [444 S.E.2d 306, 309], cert. den. *sub nom. Wilson v. Georgia* (1994) 513 U.S. 988 [115 S.Ct. 486, 130 L.Ed.2d 398]; *State v. Norris* (1989) 244 Kan. 326 [768 P.2d 296, 301-302; *State in Interest of Wells* (La.Ct.App. 1988) 532 So.2d 191, 195-197; *Com. v. Galford* (1992) 413 Mass. 364 [597 N.E.2d 410, 413-414], cert. den. *sub nom. Galford v. Massachusetts* (1993) 506 U.S. 1065 [113 S.Ct. 1010, 122 L.Ed.2d 158]; *Willie v. State* (Miss. 1991) 585 So.2d 660, 666-667; *State v. Furlough* (Tenn.Crim.App. 1990) 797 S.W.2d 631, 640-641; *State v. Kyger*

sufficient length such that the suspect has time to consult with counsel or other advisors, the police may on their own initiative re-contact the suspect. This is so since the break in custody dissipates the inherently coercive effect of custody that is the basis for *Miranda*. [Citations]."

We agree. The bright-line rule of *Edwards* was "designed to protect an *accused in police custody* from being badgered by police officers" in an effort to wear the suspect down and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance. (*Oregon v. Bradshaw* (1983) 462 U.S. 1039, 1044 [103 S.Ct. 2830, 2834, 77 L.Ed.2d 405], italics added; see also *Arizona v. Roberson, supra*, 486 U.S. 675, 685 [108 S.Ct. 2093, 2100].) "If [the defendant, during custodial interrogation, invokes his or her *Miranda* right to counsel, but] the police [then] release the defendant, and if the defendant has a reasonable opportunity to contact his attorney," there appears no reason under *Edwards* to forbid subsequent police contact. (*Dunkins v. Thigpen, supra*, 854 F.2d 394, 397.)

"Once released, the suspect is no longer under the 'inherently compelling pressures' of continuous custody where there is a reasonable possibility of wearing the suspect down by badgering police tactics to the point the suspect would waive the previously invoked right to counsel. A break in custody between the first and second interrogations also provides the suspect the opportunity to speak with an attorney, family member or any person the suspect cares to consult without police constraints." (*Bonnie H., supra*, 56 Cal.App.4th 563, 583.) We therefore adopt the premise that " 'a . . . break in custody where the defendant has a reasonable opportunity to contact his attorney [while free of custodial pressures] dissolves an *Edwards* . . . claim. [Citations.]' [Citation.]" (*Id.*, at p. 582.)[7]

The narrow nature of our holding should be emphasized. We conclude only that *Edwards* is not violated when the police recontact a suspect after a

(Tenn.Crim.App. 1989) 787 S.W.2d 13, 24-25; *Tipton v. Com.* (1994) 18 Va.App. 832 [447 S.E.2d 539, 540-541]; *State v. McKenzie* (1996) 197 W.Va. 429 [475 S.E.2d 521, 530], cert. den. *sub nom. McKenzie v. West Virginia* (1996) 519 U.S. 1016 [117 S.Ct. 529, 136 L.Ed.2d 415]; see *U.S. ex rel. Espinoza v. Fairman* (7th Cir.1987) 813 F.2d 117, 125, cert. den. (1987) 483 U.S. 1010 [107 S.Ct. 3240, 97 L.Ed.2d 745].)

[7] In *Minnick v. Mississippi* (1990) 498 U.S. 146 [111 S.Ct. 486, 112 L.Ed.2d 489], the court ruled that *Edwards* is not satisfied merely by allowing a suspect to *consult* with counsel before he is recontacted for new questioning, but that interrogation must cease until an attorney is *present*. (*Id.*, at pp. 150-156 [111 S.Ct. at pp. 489-492].) Defendant urges *Minnick* thus undermines any conclusion that a break in custody vitiates *Edwards* so long as the suspect has a mere opportunity to contact an attorney. Several decisions have rejected the contention, noting that *Minnick* was concerned with the pressures bearing upon a suspect who had remained *continuously in custody* at the time he was reapproached by the police. (*Bonnie H., supra*, 56 Cal.App.4th 563, 583; see also, e.g., *Keys v. State* (Fla.Dist.Ct.App. 1992) 606 So.2d 669, 672; *Com. v. Galford, supra*, 597 N.E.2d 410, 414, fn. 8; *Willie v. State, supra*, 585 So.2d 660, 667.) Again, we agree. Indeed, as we have seen, *McNeil, supra*, 501 U.S. 171, a

break in custody *which gives the suspect reasonable time and opportunity, while free from coercive custodial pressures, to consult counsel if he or she wishes to do so.* We do not suggest the police can avoid *Edwards* simply by allowing the suspect to step outside the station house at midnight on a Saturday, then promptly rearresting him without affording any realistic opportunity to seek counsel's assistance free of the coercive atmosphere of custody. ▇ We are persuaded, however, that the two-day midweek hiatus at issue here, from Tuesday, November 19, 1996, to Thursday, November 21, 1996, was amply sufficient to dissipate custodial pressures and permit defendant to consult counsel.[8]

Defendant urges that any break-in-custody exception cannot apply when the suspect's release is a mere ruse or pretext, undertaken in bad faith, to

---

case decided after *Minnick,* suggested that the *Edwards* no-recontact rule applies "assuming there has been no break in custody." (*McNeil, supra,* at p. 177 [111 S.Ct. at p. 2208].)

Defendant also suggests that the recent decision in *Dickerson, supra,* 530 U.S. 428, casts doubt on any break-in-custody exception to *Edwards.* In *Dickerson,* the high court confronted a congressional statute that purported to overrule *Miranda* in federal prosecutions. The *Dickerson* majority held that the law was invalid, because *Miranda* and its progeny are not mere prophylactic rules, adopted under a judicial supervisory power subordinate to legislative will, but are founded directly in the Fifth Amendment. (*Dickerson, supra.,* at pp. 432-443 [120 S.Ct. at pp. 2330-2336].) However, nothing in *Dickerson* indicates that *Edwards* must apply to one who has not been in continuous custody. Indeed, as the *Dickerson* majority noted, the fact that judicial decisions have both expanded and contracted the *Miranda* rule over the succeeding decades "illustrate[s] the principle—not that *Miranda* is not a constitutional rule—*but that no constitutional rule is immutable.* No court laying down a general rule can possibly foresee the various circumstances in which counsel will seek to apply it, and the sort of modifications represented by these cases are as much a normal part of constitutional law as the original decision." (*Dickerson, supra,* at p. 441 [120 S.Ct. at p. 2335], italics added.)

[8]Justice Chin argues that "[a] . . . two-day break in custody could hardly relieve defendant of the pressure of knowing he had already admitted to participating in a homicide." (Dis. opn. of Chin, J., *post,* at p. 1042.) But there was ample time to learn, by consultation with competent counsel, that the statements defendant had already made at the station house might well be inadmissible as proof of his guilt, and that he would thus have good reason to refuse to speak further with the police. Defendant urges he had no incentive to seek counsel's assistance because (1) Detective Rowe told him, at the conclusion of the station house interview, that the police could not legally speak to him without an attorney present, and (2) he had already "let the cat out of the bag." But Rowe told defendant only that they were going to let him go home because, in light of his request for an attorney, "legally . . . we can't . . . talk to [you] *right now.*" (Italics added.) Rowe did not state or imply that the police must avoid contact with defendant even after he left the station. Defendant knew he was the prime suspect in his wife's homicide; indeed, Rowe warned, and defendant agreed, that the matter was not concluded. We are not persuaded that, because defendant had made incriminating statements during the station house interview, he would reasonably assume there was no point in consulting a lawyer because he was beyond all legal help.

Defendant also claims he had no reasonable opportunity to consult an attorney because he was indigent and thus without funds to pay a lawyer. But by proposing, in effect, that the break-in-custody exception should not apply to indigent persons, defendant's argument sweeps far beyond the purpose of *Miranda* and *Edwards* to dispel the *coercive pressures* of *custodial* interrogation.

avoid the consequences of a prior *Miranda* violation. The Court of Appeal intimated that such considerations are irrelevant. However, we need not decide whether our analysis would change in the face of evidence of deliberate police misconduct because, as the Court of Appeal also observed, there is no such evidence here.

At the outset, there is no indication the police had an advance plan to disregard defendant's *Miranda* rights. On the contrary, Detective Rowe's undisputed testimony indicates he "belatedly realiz[ed] that [the station house interview] was tainted" (dis. opn. of Chin, J., *post,* at p. 1041) by the failure to heed defendant's requests for counsel. Rowe halted the interview in midprogress, consulted the district attorney's office, and concluded the interview should end. Because the police had no other evidence linking defendant to the homicide, Rowe saw no legal basis to detain defendant further and concluded he *had no choice* but to release defendant. Thus, the record contains no hint that the police *deliberately* elicited an invalid confession in hopes it would help them obtain a valid confession after a break in custody, or that they released defendant *for the purpose* of manipulating the break-in-custody exception to their advantage.

But despite their mistakes at the station house, the police remained obligated to press their investigation of an unsolved homicide. So long as there was a true break in custody, affording defendant reasonable time and opportunity to consult counsel while free of custodial influences, the police thereafter had the right to recontact him without undue delay. Hence, no "bad faith" or "pretext" arises simply because Detective Rowe had formed such an intent at the time of defendant's release. Nor was defendant misled into a false sense of security. He knew he was the prime suspect, and the police said nothing to suggest he was permanently immune from further questioning. (See fn. 8, *ante.*) Indeed, before leaving the station house, defendant acknowledged Rowe's warning that the matter was not concluded.

Thereafter, defendant remained at liberty, without interference by the police, for two midweek days (see fn. 8, *ante*), which gave him ample time and opportunity to rest, regroup, and obtain legal or other advice free of custodial pressure. He had the incentive to seek such help, and he had already indicated a desire for counsel's assistance. The authorities, in turn, took the risk that such a consultation would occur, and might effectively prevent them from obtaining defendant's further cooperation. (See fn. 8, *ante.*)

Detectives subsequently conducted a consensual interview at defendant's apartment, at which the incriminating statements here at issue were elicited.

Because, as defendant himself concedes, this was a *noncustodial* interview, *Miranda* procedures did not apply (see text discussion, *post*), and the interviewers thus committed no ruse or pretext by failing to obtain a new *Miranda* waiver before they questioned him. We therefore reject any suggestion that the admissions elicited at his home were obtained by deceitful or improper means.

Defendant asserts that a break-in-custody exception to *Edwards* cannot apply unless the suspect received new *Miranda* warnings before responding to police questioning following the custodial lapse. However, *Miranda* and *Edwards* apply only to *custodial* interrogation (e.g., *McNeil, supra*, 501 U.S. 171, 176-177 [111 S.Ct. 2204, 2208]; *Edwards, supra*, 451 U.S. 477, 481-482 [101 S.Ct. 1880, 1883]; *Miranda, supra*, 384 U.S. 436, 444-445 [86 S.Ct. 1602, 1612]), and defendant concedes the November 21 interview was noncustodial. *Bonnie H., supra*, 56 Cal.App.4th 563, and *Scaffidi, supra*, 11 Cal.App.4th 145, which defendant cites for this proposition, both involved *custodial* reinterrogations after lapses in custody, and are thus inapposite.[9]

Finally, defendant insists that no break-in-custody exception should apply where, as here, the police recontacted him after they had already obtained incriminating statements in violation of *Edwards*. But for reasons we have already discussed in other contexts, a prior *Edwards* violation, even one that produced damaging admissions, does not mandate a bright-line rule that further police contact be forbidden (or as the dissenters suggest, artificially deferred) even after a break in custody sufficient to permit contact with counsel. Instead, the admissibility of statements defendant made when the police recontacted him must be determined under rules which apply to any claim that a later statement was the *tainted product* of an earlier one obtained in violation of *Miranda* procedures. We proceed to a discussion of that issue.

### 2. *Tainted product.*

 Invoking the broad "fruit of the poisonous tree" doctrine developed in such cases as *Wong Sun v. United States* (1963) 371 U.S. 471 [83 S.Ct.

---

[9]Defendant notes two federal decisions which, when applying the break-in-custody exception, appeared to find it significant that renewed questioning, even in arguably noncustodial settings, was preceded by new *Miranda* advisements and waivers. (See *U.S. v. Hines, supra*, 963 F.2d 255, 257; *Dunkins v. Thigpen, supra*, 854 F.2d 394, 396, 398-400.) But defendant cites no case, and we are aware of none, in which a court *refused* to apply the break-in-custody exception to a *clearly noncustodial* new interview on grounds that no new *Miranda* waivers occurred.

Defendant briefly reasserts his theory that the detectives affirmatively *misled* him on November 21 because, by withholding *Miranda* warnings and promising he would not then be arrested, they implied that whatever he said would *not* be used against him. However, the trial court expressly found there was no "affirmative misleading," because the police simply said they would leave; they made no claims that "everything [would] be okay legally speaking." We agree.

407, 9 L.Ed.2d 441] (*Wong Sun*), defendant insists his November 21 statement is the tainted "fruit" of the *Edwards* violation at the police station on November 19. He urges that no intervening circumstance dispelled the coercive impact of the earlier refusal to honor his request for counsel, or interrupted the chain of causation, so as to rebut the presumption that the November 21 statement was obtained by exploiting the prior illegality. Indeed, he asserts, his November 21 statement must be deemed the involuntary product of the *Edwards* violation that produced his earlier admissions. ▪▪ ▪▪ This is so, he contends, because he had already "let the cat out of the bag" on November 19, thus removing all psychological incentive to remain silent on November 21. We reject these contentions.[10]

In *Oregon v. Elstad* (1985) 470 U.S. 298 [105 S.Ct. 1285, 84 L.Ed.2d 222] (*Elstad*), the high court considered whether a suspect's voluntary incriminating statement in custody, made pursuant to a waiver of *Miranda* rights, was nonetheless inadmissible because it followed an earlier incriminating statement obtained by custodial questioning without a *Miranda* warning. ▪▪ Finding that the subsequent statement need not be excluded, the *Elstad* majority held that (1) a *Miranda* violation does not require full application of the *Wong Sun* "fruit of the poisonous tree" doctrine developed for Fourth Amendment violations; (2) instead, if an unwarned custodial statement was otherwise voluntary, a later statement must be deemed untainted if also

---

[10]It must be noted that defendant did not raise this particular theory at any stage below. In the trial court, he sought to suppress his November 21 statement only on grounds that (1) the break in custody between November 19 and November 21 was a pretext to avoid the *Edwards* no-recontact rule, and (2) the detectives *misled* him on November 21 (see discussion *ante,* fn. 9). Thus, although the trial court agreed with defendant that questioning should have ceased on November 19 after he requested counsel, the court made no findings on whether the statements subsequently elicited on November 19 tainted the November 21 admissions. Similarly, defendant did not pursue this issue in the Court of Appeal.

"[A] claim [that a confession or admission to the police should be excluded from evidence] generally will not be addressed for the first time on appeal" when, because of the defendant's earlier failure to raise the theory now asserted, "the parties had no incentive to fully litigate this theory . . . , and the trial court had no opportunity to resolve material factual disputes and make necessary factual findings." (*People v. Ray* (1996) 13 Cal.4th 313, 339 [52 Cal.Rptr.2d 296, 914 P.2d 846]; see also *People v. Ochoa* (1998) 19 Cal.4th 353, 392, fn. 1 [79 Cal.Rptr.2d 408, 966 P.2d 442]; *People v. Mayfield* (1993) 5 Cal.4th 142, 172 [19 Cal.Rptr.2d 836, 852 P.2d 331]; *People v. Kelly* (1992) 1 Cal.4th 495, 519 [3 Cal.Rptr.2d 677, 822 P.2d 385].) As we explain below, the question whether defendant's November 21 statement was the tainted product of his November 19 admissions centers around whether each of these statements was *voluntary.* No theory presented to the trial court directly required it to focus on these mixed questions of fact and law.

Nonetheless, it appears the trial court did expressly or impliedly determine that each statement was voluntary, and the record amply supports those determinations. (See text discussion, *post.*) The People do not argue in this court that the tainted product theory was waived, or that they are prejudiced by defendant's failure to raise it below. We therefore proceed to consider it.

voluntary *and* in compliance with *Miranda*; and (3) in determining whether the second statement was voluntary, the suspect's awareness that he had already "let the cat out of the bag" is not dispositive.

■ As *Elstad* explained at length, the exclusionary rule serves different purposes under the Fourth and Fifth Amendments. Exclusion of statements or evidence obtained as the fruits of an unreasonable search or seizure prohibited by the Fourth Amendment is necessary to deter direct violations of that constitutional guarantee. Thus, even if a confession arising from a Fourth Amendment violation is "voluntary," that is only a "threshold requirement" in determining its admissibility; "the prosecution must [further] show a sufficient break in events to undermine the inference that the confession was *caused* by the Fourth Amendment violation." (*Elstad, supra,* 470 U.S. 298, 306 [105 S.Ct. 1285, 1291], italics added; see also *Taylor v. Alabama* (1982) 457 U.S. 687, 690 [102 S.Ct. 2664, 2667, 73 L.Ed.2d 314]; *Brown v. Illinois* (1975) 422 U.S. 590, 602 [95 S.Ct. 2254, 2261, 45 L.Ed.2d 416].)

On the other hand, the Fifth Amendment, at bottom, protects against *compelled* testimonial self-incrimination. *Miranda* and its progeny are designed to allow *full understanding and exercise* of this constitutional right in the inherently custodial atmosphere of police custody. However, "[t]he failure of police to administer *Miranda* warnings does not mean that the statements received have actually been coerced, but only that courts will presume the privilege against compulsory self-incrimination has not been intelligently exercised. [Citations.]" (*Elstad, supra,* 470 U.S. 298, 310 [105 S.Ct. 1285, 1293].) Thus, such statements must be excluded even if they were "*otherwise voluntary* within the meaning of the Fifth Amendment." (*Id.,* at p. 307 [105 S.Ct. at p. 1292], italics added.)

But it does not follow that the *fruits* of such an "otherwise voluntary" statement are invariably tainted and inadmissible. For example, according to the *Elstad* court, *Michigan v. Tucker* (1974) 417 U.S. 433, 445 [94 S.Ct. 2357, 2364, 41 L.Ed.2d 182], had held that "neither the general goal of deterring improper police conduct nor the Fifth Amendment goal of assuring trustworthy evidence" would be served by suppressing the testimony of a witness whose identity was discovered as the result of a suspect's statement in custody which, though elicited without *Miranda* warnings, was otherwise uncoerced. (*Elstad, supra,* 470 U.S. 298, 308 [105 S.Ct. 1285, 1292-1293].)

"We believe that this reasoning applies with equal force when the alleged 'fruit' of a noncoercive *Miranda* violation is neither a witness nor an article of evidence but the accused's own voluntary testimony. . . . Once warned, the suspect is free to exercise his own volition in deciding whether or not to

make a statement to the authorities. The Court has often noted: ' "[A] living witness is not to be mechanically equated with the proffer of inanimate evidentiary objects illegally seized. . . . [T]he living witness is an individual human personality whose attributes of will, perception, memory and *volition* interact to determine what testimony he will give." ' [Citations.]" (*Elstad, supra,* 470 U.S. 298, 308-309 [105 S.Ct. 1285, 1293], italics in *Elstad.*)

Under these circumstances, the "break in events" analysis applied to the fruits of Fourth Amendment violations is inapposite. ▮ Where a prior custodial statement, though obtained without *Miranda* warnings, was otherwise uncoerced, any taint upon a second statement is dissipated by a determination that the second statement was itself voluntary and obtained without a *Miranda* violation. (*Elstad, supra,* 470 U.S. 298, 310-311 [105 S.Ct. 1285, 1293-1294].)

Moreover, a later statement obtained in compliance with *Miranda,* and without coercive methods of interrogation, is not to be presumed involuntary simply because the suspect has already incriminated himself. " '[A]fter an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. . . . But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed.' " (*Elstad, supra,* 470 U.S. 298, 311 [105 S.Ct. 1285, 1294], quoting *United States v. Bayer* (1947) 331 U.S. 532, 540-541 [67 S.Ct. 1394, 1398, 91 L.Ed. 1654].)

Indeed, the *Elstad* majority observed, "[t]his Court has never held that the psychological impact of voluntary disclosure of a guilty secret qualifies as state compulsion or compromises the voluntariness of a subsequent informed waiver. . . . When neither the initial nor the subsequent admission is coerced, little justification exists for permitting the highly probative evidence of a voluntary confession to be irretrievably lost to the factfinder. [¶] There is a vast difference between the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated to break the suspect's will and the uncertain consequences of disclosure of a 'guilty secret' freely given in response to an unwarned but noncoercive question . . . ." (*Elstad, supra,* 470 U.S. 298, 312 [105 S.Ct. 1285, 1294-1295].)

Under such circumstances, "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has

made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights." (*Elstad, supra,* 470 U.S. 298, 314 [105 S.Ct. 1285, 1296].)

 Defendant, and the dissenters, insist *Elstad* is distinguishable. As they note, the *Elstad* majority limited its holding to cases in which the *Miranda* violation was a mere failure to provide *warnings* of the rights to silence and counsel, and expressly declined to decide whether similar rules might apply where "[suspects'] invocation of their rights to remain silent and to have counsel present were flatly ignored while police subjected them to continued interrogation. [Citations.]" (*Elstad, supra,* 470 U.S. 298, 313, fn. 3 [105 S.Ct. 1285, 1295].) Defendant and the dissenters urge that where the police elicited incriminating statements by ignoring a custodial suspect's request for counsel, the more stringent *Wong Sun* analysis must apply, and any later confession, even if otherwise valid, must be presumed the tainted product of the earlier illegality.

In a 1993 decision on which both defendant and the dissenters heavily rely, we applied pre-*Elstad* California precedent to conclude that when the police improperly elicit incriminating statements from a custodial suspect who has invoked his *Miranda* rights, any subsequent statement by the suspect must be "presumed" the tainted product of the first because the suspect has already " ' "let the cat out of the bag by confessing." ' " (*Sims, supra,* 5 Cal.4th 405, 444-445, citing *People v. Johnson* (1969) 70 Cal.2d 541, 547 [75 Cal.Rptr. 401, 450 P.2d 865, 43 A.L.R.3d 366] and *People v. Spencer* (1967) 66 Cal.2d 158, 167 [57 Cal.Rptr. 163, 424 P.2d 715].) We said that, to overcome the presumption and show sufficient attenuation to dissipate the taint, the People must demonstrate " 'at least an intervening independent act by the defendant or a third party' to break the causal chain in such a way that the second confession is not in fact obtained by exploitation of the illegality." (*Sims, supra,* at p. 445, citing *People v. Sesslin* (1968) 68 Cal.2d 418, 425 [67 Cal.Rptr. 409, 439 P.2d 321] and *People v. Rich* (1988) 45 Cal.3d 1036, 1081 [248 Cal.Rptr. 510, 755 P.2d 960].) Despite a brief reference to *Elstad, supra,* 470 U.S. 298 (*Sims, supra,* at p. 446), our *Sims* opinion made no effort to address how the sharply different analysis of *Elstad* might pertain to facts like those presented by *Sims* and this case.

More recently, we considered that issue. Undermining *Sims, supra,* 5 Cal.4th 405, we unanimously concluded that the less stringent *Elstad*

"tainted product" analysis applies when a prior confession was obtained despite the custodial suspect's *Miranda* request for counsel. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1039-1040 [60 Cal.Rptr.2d 225, 929 P.2d 544], cert. den. *sub nom. Bradford v. California* (1997) 522 U.S. 953 [118 S.Ct. 377, 139 L.Ed.2d 293] (*Bradford*).)

The facts of *Bradford* are instructive. In the early morning of April 19, 1988, suspect Bradford was in custody after his arrest for murder. When Detective Riehl sought to question Bradford, he refused to waive his *Miranda* rights and stated he wanted a lawyer. But Riehl persisted. Riehl urged Bradford to unburden his guilty conscience, assured Bradford their conversation was off the record, and advised Bradford he was "safe" from a "legal standpoint" because he had requested an attorney. (*Bradford, supra,* 14 Cal.4th at p. 1026.) Bradford confessed.

Later the same morning, while Bradford remained in custody, he was approached by Detective Hooks. Hooks again interviewed Bradford "off the record," and Bradford again confessed. During the interview, Hooks pressed the theme that Bradford would feel better if he talked. Hooks also professed sympathy for Bradford's "problems," including drug and alcohol abuse, that might have contributed to the crime. Hooks suggested that, although no promises could be made and Bradford must pay for what he did, his best chance to get help for his problems was to tell his side of the story on the record. Hooks urged Bradford to contact him if he wished to do so. (*Bradford, supra,* 14 Cal.4th at pp. 1029-1030.)

Bradford remained in custody overnight. The next morning, April 20, 1988, he sent for Detective Arnold, indicated a willingness to talk on the record, waived his *Miranda* rights, and confessed once more.

Bradford moved to suppress all three confessions. The trial court found that the Riehl confession, though uncoerced, was obtained in violation of *Edwards.* The court therefore excluded this confession from the prosecution's case-in-chief. The court concluded that the Hooks confession stemmed from coercive police tactics, and therefore suppressed it entirely. However, the court admitted the Arnold confession for all purposes, reasoning that it was properly obtained after Bradford himself initiated contact and volunteered to talk. Bradford was convicted of murder.

On appeal, Bradford urged that the Arnold confession should also have been suppressed as the tainted product of the earlier *Edwards* violations. We conceded that the Riehl and Hooks interviews were improper under *Edwards,* and the confessions thereby obtained were thus properly excluded.

However, we held, this did not mean the Arnold confession also must be suppressed.

Noting the factual distinction between *Elstad* and Bradford's case, we nonetheless reasoned that "just as a failure to give *Miranda* warnings does not in and of itself constitute coercion ([*Elstad*], *supra*, 470 U.S. [298,] 307, fn. 1 [84 L.Ed.2d 222, 230-231]), neither does continued interrogation after a defendant has invoked his right to counsel, or an *Edwards* violation, inherently constitute coercion. [Citation.]" (*Bradford, supra,* 14 Cal.4th 1005, 1039.) As we explained, the *Edwards* rule simply " 'ensures that any statement made in subsequent interrogation is not the result of coercive pressures. . . .' " (*Bradford, supra,* at p. 1040, quoting *Minnick v. Mississippi, supra,* 498 U.S. 146, 151 [111 S.Ct. 486, 489].)

Yet "[t]he United States Supreme Court itself has observed that 'the *Edwards* rule cannot be said to be a *sine qua non* of fair and accurate interrogation.' (*Solem v. Stumes* [(1984)] 465 U.S. [638,] 644.) '. . . *Edwards* did not confer a substantive constitutional right that had not existed before; it "created a protective umbrella serving to enhance a constitutional guarantee." ' (*Id.,* at p. 644 & fn. 4 [79 L.Ed. 2d at p. 588], citation omitted).

"Thus, we cannot conclude that an *Edwards* violation, 'unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period.' ([*Elstad*], *supra,* 470 U.S. [298,] 309 [84 L.Ed. 222, 232].) Rather, if the statement made after an *Edwards* violation is voluntary, 'the admissibility of any subsequent statement should turn . . . solely on whether it is knowingly and voluntarily made.' (*Ibid.*)" (*Bradford, supra,* 14 Cal.4th 1005, 1040.) [11]

We then proceeded to determine, under the totality of circumstances (see *Moran v. Burbine* (1986) 475 U.S. 412, 421 [106 S.Ct. 1135, 1140-1141, 89

---

[11]Defendant argues that in light of *Dickerson, supra,* 530 U.S. 428, *Elstad* and *Bradford* are no longer good authority for the proposition that a less stringent tainted-product analysis applies to *Miranda* violations than to Fourth Amendment violations. Defendant asserts that *Elstad* and *Bradford* relied heavily on the traditional notion that *Miranda* procedures are not *direct* constitutional requirements, but are mere prophylactic measures designed to assure protection of Fifth Amendment rights in a custodial setting. *Dickerson* laid this erroneous premise to rest, defendant urges, by holding that "*Miranda* announced a *constitutional* rule" which legislation cannot supersede. (*Dickerson, supra,* at p. 444 [120 S.Ct. at p. 2336], italics added.) In fact, however, *Dickerson* laid to rest defendant's contention that *Elstad* does not survive. As the *Dickerson* majority noted, "[o]ur decision in [*Elstad*]—refusing to apply the traditional 'fruits' doctrine developed in Fourth Amendment cases—does not prove that *Miranda* is a nonconstitutional decision, but simply recognizes the fact that unreasonable searches under the Fourth Amendment are different from unwarned interrogation under the

L.Ed.2d 410]), whether the Riehl and Hooks confessions, though obtained in violation of *Edwards*, were voluntary. In doing so, we cautioned that while a police violation of *Miranda* is a circumstance bearing on voluntariness, a *Miranda* violation does not invariably *constitute* coercion for purposes of determining whether a subsequent statement was voluntarily given. (*Bradford*, supra, 14 Cal.4th 1005, 1041, citing *Withrow v. Williams* (1993) 507 U.S. 680, 693-694 [113 S.Ct. 1745, 1754, 123 L.Ed.2d 407]; *Colorado v. Connelly* (1986) 479 U.S. 157, 164, fn. 2 [107 S.Ct. 515, 520, 93 L.Ed.2d 473]; and *Elstad*, supra, 470 U.S. 298, 307, fn. 1 [105 S.Ct. 1285, 1292].) We also admonished that "[t]he Fifth Amendment is not 'concerned with moral and psychological pressures to confess emanating from sources other than official coercion.' ([*Elstad*], supra, . . . at pp. 304-305 [84 L.Ed.2d at p. 229].)" (*Bradford*, supra, at p. 1041.)

After independently reviewing the evidence under these standards, we concluded that defendant had voluntarily confessed to both Riehl and Hooks. We noted, as had the trial court, that the tapes of both the Riehl and Hooks interviews indicated defendant's willingness, even eagerness, to talk once told his statements were off the record. We further observed that, though the trial court was concerned about Hooks's " 'almost outrageous' " conduct in reapproaching Bradford after he requested counsel, the court had noted it was " 'not going to the extent of saying there was coercion in the sense of a person's will was broken down.' " (*Bradford*, supra, 14 Cal.4th 1005, 1042.) We agreed that though Hooks's conduct was unethical and must be "strongly disapproved," it did not "deprive[ ] [Bradford] of the ability to freely and deliberately choose to speak to either detective." (*Ibid.*)

Finally, we concluded that Hooks's extensive efforts to establish rapport with Bradford did not constitute coercion. As we noted, Hooks's empathetic references to Bradford's substance abuse problems were not interrogation techniques " ' "so offensive to a civilized system of justice that they must be condemned." ' [Citations.]" (*Bradford*, supra, 14 Cal.4th 1005, 1043.)

We further determined that in the subsequent interview with Detective Arnold, also undertaken in custody, Bradford had knowingly and voluntarily waived his *Miranda* right to counsel, and had confessed of his own free will. On the latter point, we stressed that Bradford himself had reinitiated contact with Arnold. Moreover, we pointed out, at the outset of the Arnold interview, Bradford said he had some questions, and would "probably" talk, though he was not sure. "This statement indicates, as the trial court observed, that [Bradford] did not feel that his prior statements had made his

---

Fifth Amendment." (*Dickerson*, supra, at p. 441 [120 S.Ct. at p. 2335].) *Bradford*, of course, recognized a similar difference between Fourth Amendment and *Edwards* violations.

current confession a foregone conclusion. [Moreover,] . . . the tape of this interrogation 'clearly indicate[d] [Bradford's] eagerness to talk . . . .' " (*Bradford, supra,* 14 Cal.4th 1005, 1043.)

Similarly here, we conclude that despite any *Edwards* violation on November 19, 1996, the statements defendant made on that date were otherwise voluntary. The trial court found that though polygraph operator Redden engaged in "skillful" questioning after defendant expressed the need to consult counsel, Redden's tactics were not "overtly threatening." Indeed, the court noted, "[v]iewing the videotape [of the interview], [defendant] seemed ready to talk. There were no lengthy pauses. He volunteered a lot of information to Mr. Redden at the time . . . ." Moreover, the court observed, at the end of the interview, defendant expressed "an interest in having the detectives look at the case from his standpoint utilizing witnesses he [said] he [had], which were witnesses he repeatedly had made references to in the preceding pages. And clearly he's indicating he wants some further work done . . . ."

The record amply supports this assessment. None of the circumstances of the November 19 interview suggest that defendant's free will was overborne by state compulsion. Defendant arrived at the station on his own, was treated courteously, was not deprived of human comforts or necessities, and was not worn down by lengthy interrogation. Though Redden did not honor defendant's request for counsel, Redden employed no interrogation techniques involving actual physical or psychological coercion. He merely offered a sympathetic ear and encouraged defendant to keep talking.[12]

Little encouragement was needed. Though emotional and disjointed, defendant's statement emerged in narrative form. Defendant expressed an understanding of his predicament, and he tried on several occasions to restrain himself before more damage was done, but once told he had failed the polygraph examination, he displayed a manifest eagerness to unburden his conscience. He told Redden he should not have agreed to the test, because he knew he could not lie. He insisted at several points that he wanted to help the authorities close the case. Indeed, he seemed motivated in large part by a desire to put forth a self-serving version of his role in Andrade's death.

Before leaving the station on November 19, defendant pressed Detective Rowe to contact witnesses who would corroborate his claims about Andrade's depressed mental state. He also told Rowe that while he wished he had not said anything, "I can't live with the guilt either." Thus, there seems

---

[12]Indeed, unlike the *Bradford* interrogators, Redden made no claim that his conversation with defendant was off the record, thereby lulling defendant into a false sense of security.

no doubt that defendant's statements on November 19 stemmed not from police coercion but from his own troubled conscience, his assumption he would inevitably be caught, and a desire to minimize his culpability.

Defendant points to his several complaints, during the November 19 interview, that he had gotten no sleep the previous night. But defendant's lack of rest was not the result of state compulsion. We have little difficulty in concluding, as the trial court implicitly did, that defendant's November 19 statement was voluntary.

The same is true of the November 21 statement. Defendant stresses that he did not recontact the detectives between November 19 and November 21, but all other signs are that he spoke with them freely. On November 19, Detective Rowe had admonished him that the matter was not concluded. Defendant had responded he realized this was so, and he had urged Rowe to investigate and confirm Andrade's suicidal depression. The trial court viewed this latter action as "clearly . . . an effort on [defendant's] part to reinitiate some contact with the police." Thereafter, defendant had been free for two days, with ample opportunity to consider his situation and seek help, including legal assistance, if he wished.

On November 21, the officers approached him at his home. As the trial court recited, "they knock[ed] at the door, [and] contact[ed] [defendant] who invite[d] them to come in and agree[d] to talk to them." "They [told] him they [would] leave . . . [a]t the conclusion of the interview, [and] they [did] leave, and he [was] free to go about his business." The interview itself lasted slightly over one hour. The detectives used no coercive tactics. As on November 19, defendant did most of the talking, while the officers interrupted only occasionally to clarify points he had made. In the interview transcript, defendant displays no agitation or hesitancy. He appears calm, prepared, and intent on presenting a coherent and sympathetic version of his claim that he assisted Andrade to commit suicide.

Moreover, defendant made clear on November 21 that he was not confessing simply because he had already incriminated himself on November 19. On the contrary, he said he assumed he had left telltale evidence behind, always knew he could not get away with it, and never really intended to escape, but attempted a feeble coverup only because of a human instinct for "self-preservation." Indeed, defendant remarked, "the first night you were here and said you'd probably want me to come down for a polygraph, . . . *I knew it was over*." (Italics added.) He indicated that his motive in talking to the officers was simply to "tell[ ] you the absolute truth and try[ ] to

convince you. *I really felt obligated.*" (Italics added.) Under these circumstances, we are amply persuaded that defendant's November 21 statement, like the one he gave on November 19, was voluntary.[13]

Defendant urges that the November 21 statement nonetheless fails to meet an additional requirement of *Elstad* and *Bradford.* Under those decisions, he insists, when a prior statement was obtained in violation of *Miranda,* the state must show not only that a subsequent confession was voluntary, but also that the suspect received new *Miranda* warnings and expressly rewaived the *Miranda* rights to silence and counsel. Defendant emphasizes again that the police did not re-*Mirandize* him before he was questioned on November 21, and he did not explicitly agree to give up the rights provided by *Miranda.* The dissenters, too, cite the failure to give new *Miranda* warnings as a factor weighing against any conclusion that the November 21 statement was voluntary.

However, defendant was *not in custody* on November 21. As we have previously observed, *Miranda* procedures apply only in the custodial setting. In both *Elstad* and *Bradford,* suspects requestioned by the police after prior *Miranda* violations *remained in custody.* Any suggestion in those decisions that new *Miranda* advisements and waivers were necessary must be understood in that context.

Indeed, in *Elstad,* the suspect *had not* heard and waived his *Miranda* rights before first giving an incriminating response to custodial police questioning.

---

[13]The dissenters stress *People v. Montano* (1991) 226 Cal.App.3d 914 [277 Cal.Rptr. 327], as support for their argument that neither of defendant's statements was voluntary. We do not find *Montano* persuasive here. *Montano* relied to a considerable degree on the premise that police failures to honor a custodial suspect's invocations of his right to silence were themselves a form of actual coercion which likely carried over to a subsequent custodial confession. (*Montano, supra,* at pp. 933-937.) After *Montano* was decided, *Bradford, supra,* 14 Cal.4th 1005, made clear that failures to heed a suspect's invocation of *Miranda* rights, standing alone, do not necessarily constitute actual coercion. (*Bradford, supra,* at pp. 1039-1041.) Moreover, *Montano*'s facts differ from those of the instant case in several crucial respects. Montano, an 18-year-old illegal immigrant who spoke poor English, was arrested after midnight and grilled in the early morning hours by two skilled interrogators (one acting as interpreter). (*Montano, supra,* at pp. 920-921, 936-937.) The officers *agreed in advance* to disregard his *Miranda* rights (*id,* at p. 935, & fn. 6), and they used multiple psychological ploys, including an appeal to his Catholic religion, to get him to talk. (*Id.,* at pp. 921-929, 936-937.) He held out for an hour and a half, volunteering nothing and stating consistently, to no avail, that he did not want to discuss the crime. The interrogators said that even if the current interview ended, officers would want to talk to him again, and they pressured him into a promise that he would talk "tomorrow." (*Id.,* at pp. 921-929.) Finally, just before 5:30 a.m., he answered " '[n]o' " when asked whether " 'there [is] a person . . . still in the streets that we should be looking for.' " (*Id.,* at p. 928.) He was then booked and placed in a cell; *there was no break in custody.* (*Id.,* at p. 929.) Less than *five hours* later, while still in custody, he gave up, summoned his jailer, and said he wanted to talk; an interview was immediately arranged, and he confessed. (*Ibid.*)

It was thus logical to hold that a *second* custodial interrogation was *also* invalid unless it was preceded by explicit *Miranda* warnings and waivers.

Here the police *did* give defendant full *Miranda* warnings before they first questioned him on November 19. During that interview, defendant evidenced his understanding of his *Miranda* rights by attempting to invoke them. Moreover, he knew on November 19 that he should expect further contact with the police, and he had two intervening days to consult the lawyer he then said he wanted. A competent attorney would undoubtedly have further stressed defendant's right to silence. We conclude no new warnings and waivers were necessary here. Defendant's November 21 statement is not tainted by any *Edwards* violation that occurred two days earlier.

The dissenters lament that, by finding defendant's November 21 statement admissible, we "remove any incentive" for police to honor suspects' *Miranda* rights to stop custodial questioning (dis. opn. of Chin, J., *post*, at p. 1040) and "encourage precisely the sort of subterfuge by . . . law enforcement investigators . . . that *Miranda* sought to end" (dis. opn. of George, C. J., *post*, at p. 1040.). For several reasons, we are not persuaded by these criticisms. First, as indicated, *we have found no evidence of ruse, subterfuge, or pretext in this case, and have limited our holding accordingly.*

Moreover, schemes to violate *Miranda* deliberately, then to manipulate the break-in-custody exception in hopes of obtaining valid confessions, are fraught with risks and difficulties that diminish their allure. After all, any such scheme necessarily involves the suspect's *release*. This, in turn, leaves the suspect free to learn information (including the invalidity of his prior statement) that would encourage him to refuse further cooperation when recontacted. (Indeed, in this case, defendant, who was not being observed by the police, was at large and presumably free to take flight.) Moreover, even if a later statement is obtained, the issue will inevitably arise whether its validity is tainted by the prior illegality. Considerations of this kind lead us to believe the dissenters exaggerate the enthusiasm with which police would embrace the "subterfuge" they envision. ██ ██ Accordingly, the concerns they express do not dissuade us from our result.[14]

---

[14]It is established, of course, that statements obtained in violation of *Miranda* procedures, if actually voluntary, are admissible for *impeachment* in the event the defendant gives inconsistent testimony at his trial (e.g., *Oregon v. Hass* (1975) 420 U.S. 714, 722 [95 S.Ct. 1215, 1221, 43 L.Ed.2d 570] [refusal to honor suspect's request for counsel]; *Harris v. New York* (1971) 401 U.S. 222, 224, 226 [91 S.Ct. 643, 646, 28 L.Ed.2d 1] [failure to provide *Miranda* warnings]), and we have held that this rule applies even when the police dishonor a request for counsel as part of a *deliberate plan to obtain impeachment evidence* (*People v. Peevy* (1998) 17 Cal.4th 1184, 1191-1205 [73 Cal.Rptr.2d 865, 953 P.2d 1212]). Thus, the differ-

## DISPOSITION

Like the Court of Appeal, we conclude that the trial court did not err by admitting in evidence defendant's November 21, 1996, statement to the police. We therefore affirm the Court of Appeal's judgment.

Werdegar, J., Brown, J., and Moreno, J., concurred.

**KENNARD, J.,** Concurring and Dissenting.—I concur in the majority's holding that defendant's second confession was not obtained in violation of *Edwards v. Arizona* (1981) 451 U.S. 477, 484-485 [101 S.Ct. 1880, 1885, 68 L.Ed.2d 378] (*Edwards*), which requires that once a suspect in custody invokes the right to counsel, the police must cease all interrogation unless the suspect initiates further conversation.

Unlike the majority, however, I would not address defendant's additional claim that even if his second confession was not obtained in violation of *Edwards*, that confession was involuntary because it was the tainted product of his earlier, custodial confession. Because, as the majority concedes, defendant did not raise this claim below (maj. opn., *ante*, at p. 1028, fn. 10), he has not preserved it for our review. (*People v. Michaels* (2002) 28 Cal.4th 486, 511-512 [122 Cal.Rptr.2d 285, 49 P.3d 1032]; *People v. Ray* (1996) 13 Cal.4th 313, 339 [52 Cal.Rptr.2d 296, 914 P.2d 846].) Therefore, I see no need here to apply the voluntariness analysis this court articulated in *People v. Bradford* (1997) 14 Cal.4th 1005 [60 Cal.Rptr.2d 225, 929 P.2d 544].

I would apply the voluntariness analysis of *People v. Bradford, supra,* 14 Cal.4th at pages 1039-1040, only if a defendant claims that a prerelease custodial confession taken in violation of *Edwards, supra,* 451 U.S. at pages 484-485 [1015 S.Ct. at page 1885], was actually, rather than presumptively, coerced. Only then would it be necessary to apply *Bradford* to determine whether the defendant's postrelease confession is the illegal fruit of the earlier coerced confession. Here, defendant has failed to preserve a claim of actual coercion, thus obviating any need for the majority's discussion of whether his first confession was voluntary.

**GEORGE, C. J.**—I respectfully dissent. Justice Chin's eloquent dissent illuminates the deep flaws inherent in the majority's reasoning. Beyond what

---

ence between deliberate and merely negligent *Miranda* violations does not necessarily upset the delicate balance between protection of a custodial suspect's Fifth Amendment rights on the one hand, and the legitimate use of voluntary, and thus presumably trustworthy, confessions on the other. (Cf., e.g., *U.S. v. Orso* (9th Cir. 2001) 266 F.3d 1030, 1034-1039 [officer's extraction of deliberately unwarned statement from suspect in custody does not require suppression of second, *Mirandized* custodial statement where both statements were actually voluntary].)

he has written, there is little to add. I write separately simply to emphasize that, regardless of the degree of one's enthusiasm concerning the prophylactic protections afforded by *Miranda v. Arizona* (165) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974] (*Miranda*), we are obligated to follow that decision as long as it remains the law. We should not countenance a ruse whereby *Miranda* is given judicial lip service—obeyed in name but not in fact. Unfortunately, the court's opinion today will encourage precisely the sort of subterfuge by some law enforcement investigators, with the ensuing violation of constitutional rights, that *Miranda* sought to end. (See *Miranda, supra,* 384 U.S. at pp. 454-455 [86 S.Ct. at p. 1617] [noting the various techniques in which law enforcement interrogators are trained to deflect, if not defeat, a subject's professed desire to speak with an attorney]; *People v. Peevy* (1998) 17 Cal.4th 1184, 1205-1207 [73 Cal.Rptr.2d 865, 953 P.2d 1212]; see also *People v. Sims* (1993) 5 Cal.4th 405, 445 [20 Cal.Rptr.2d 537, 853 P.2d 992] [dissipation of the taint occasioned by improper police conduct " 'requires at least an intervening independent act by the defendant or a third party' to break the causal chain in such a way that the second confession is not in fact obtained by exploitation of the illegality"].) The court's holding departs from *Miranda* and its case law progeny, in favor of approving an investigatory approach that is totally artificial in its protection of the constitutional rights accorded an accused. For these reasons, I have joined Justice Chin's dissent.

**CHIN, J.,** Dissenting.—Few persons would welcome the prospect of suppressing a murderer's uncoerced confession. Often, and quite possibly in this case, such a confession affords the primary evidence linking the suspect to his crime. But cases do occur in which suppressing such a confession becomes not only an unwelcome and distasteful option but a constitutional necessity. This is such a case. As I will explain (*post*, at pp. 1046-1047), the majority's contrary holding will remove any incentive on the part of law enforcement officers to comply with federal constitutional decisions requiring them to terminate an interrogation once the suspect requests counsel.

The United States Supreme Court long ago admonished that once a suspect invokes his right to counsel, *further interrogation must cease* until counsel is afforded him, or until the suspect himself initiates further communication. (*Edwards v. Arizona* (1981) 451 U.S. 477, 484-485 [101 S.Ct. 1880, 1885, 68 L.Ed.2d 378] (*Edwards*); *Miranda v. Arizona* (1966) 384 U.S. 436, 474 [86 S.Ct. 1602, 1627, 16 L.Ed.2d 694, 10 A.L.R.3d 974] (*Miranda*).) Indeed, *Miranda* could hardly be clearer on the point: "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." (*Miranda, supra,* 384 U.S. at p. 474 [86 S.Ct. at p. 1628].)

Here, the officers (acting through a police polygraph operator, Redden) read to defendant his *Miranda* rights but then proceeded to ignore his continual requests for counsel and exacted statements deeply implicating him in his wife's murder, statements which, as the majority acknowledges, were inadmissible against him. After belatedly realizing that the interrogation was tainted, the officers temporarily terminated the interview, only to resume it, *at their own initiative*, at defendant's home two days later. Without providing defendant with counsel or reminding him of his *Miranda* rights, the officers had no difficulty whatever in exacting from him additional statements confirming his central role in his wife's murder. As the saying goes, by that time "the cat was out of the bag."

The majority finds these subsequent statements, made after defendant had already confessed during an unlawful interrogation, were admissible against him because they were voluntary and noncustodial in nature, being made following a "break in custody." (E.g., *In re Bonnie H.* (1997) 56 Cal.App.4th 563, 579-585 [65 Cal.Rptr.2d 513] *(Bonnie H.)*.) The break-in-custody cases the majority cites for support are distinguishable, as each case involved defendants whose interrogations were discontinued upon their requests for counsel, *without ignoring those requests and eliciting any incriminatory statements.*

For example, in *Bonnie H.,* police officers questioned the minor concerning an apparent suicide/murder. Immediately after hearing a recitation of her *Miranda* rights, the minor requested an attorney, the interrogation stopped, and she was released from custody. Approximately a month later, the officers rearrested the minor and, after being reread her *Miranda* rights, the minor agreed to talk and made incriminating statements. *(Bonnie H., supra,* 56 Cal.App.4th at pp. 566-567.) The court found that "there was a *good faith* break in custody between this [second] police-initiated custodial session and the first . . . ." *(Id.* at p. 567, italics added.)

The *Bonnie H.* court observed that "in light of the remedial purpose for the *Edwards* rule [*(Edwards, supra,* 451 U.S. 477)] in preventing police badgering during custodial questioning, many jurisdictions have declined to apply the *Edwards* rule where a defendant has not been in continuous custody but is instead reinterrogated after being released from custody. [Citations.]" *(Bonnie H., supra,* 56 Cal.App.4th at pp. 581-582.) As the *Bonnie H.* court stated, "Once released, the suspect is no longer under the 'inherently compelling pressures' of continuous custody where there is a reasonable possibility of wearing the suspect down by police badgering tactics to the point the suspect would waive the previously invoked right to counsel." *(Id.* at p. 583.) *Bonnie H.* indicated, however, that the break in custody should be in

"good faith" and "not contrived or pretextual." (*Id.* at p. 584.) The court concluded that the good faith break in custody dissolved the bar to admission of the minor's statements at the second interview. (*Id.* at pp. 584-585.)

Similarly, in *People v. Scaffidi* (1992) 11 Cal.App.4th 145 [15 Cal.Rptr.2d 167], the defendant requested an attorney upon being arrested and the interrogation ceased. After release on bail, he was rearrested the next day on unrelated charges and agreed to talk to the officers without counsel. (See *id.* at p. 149.) The court, noting the temporary break in custody, invoked the "noncontinuous custody" exception to the rule that all interrogation must cease once a suspect invokes his right to counsel. The *Scaffidi* court found that "there is no indication in the record that the break in custody was contrived or pretextual. . . . On these facts, we hold that the *Edwards* ban was dissolved by the break with respect to defendant's request for counsel during his first custody." (*Id.* at p. 152; see also *Dunkins v. Thigpen* (11th Cir. 1988) 854 F.2d 394, 397, fn. 6 [suggesting break in custody cannot be contrived or pretextual]; Shapiro, *Thinking the Unthinkable: Recasting the Presumption of Edwards v. Arizona* (2000) 53 Okla. L.Rev. 11, 23-25, 32 (Shapiro) [critically analyzing break-in-custody rule]; Strauss, *Reinterrogation* (1995) 22 Hastings Const. L.Q. 359, 386-392 (Strauss) [same].)

By contrast, in the present case, defendant's first interview was terminated only after he had unsuccessfully requested counsel and thereafter had implicated himself in his wife's death by admitting he had abetted her suicide. A subsequent two-day break in custody could hardly relieve defendant of the pressure of knowing he had already admitted to participating in a homicide. As defendant himself said near the close of the November 19 interview, "I've already told you, told you too much and it's on tape. . . . [¶] You guys are gonna book me, you're gonna book me." Defendant undoubtedly realized that, having let the proverbial cat out of the bag at the November 19 interview, any break in custody would be only temporary until further interrogation, and probable arrest, ensued. Under these circumstances, we should decline to hold that defendant's statements during the resumed interview, *unaccompanied by renewed Miranda warnings or other intervening circumstances such as consultation with counsel,* were admissible merely by reason of the two-day break in custody necessitated by the officers' breach of defendant's *Miranda* rights. Instead, our *Sims* case should govern, and the burden pass to the prosecution to show the taint of the first confession was dispelled by some "intervening independent act" not present here. (*People v. Sims* (1993) 5 Cal.4th 405, 445 [20 Cal.Rptr.2d 537, 853 P.2d 992], cert. den. (1994) 512 U.S. 1253 [114 S.Ct. 2782, 129 L.Ed.2d 893] (*Sims*); *id.* at pp. 444-447; see also *People v. Beardslee* (1991) 53 Cal.3d 68, 108-111 [279 Cal.Rptr. 276, 806 P.2d 1311]; *People v. Spencer* (1967) 66 Cal.2d 158,

167-168 [57 Cal.Rptr. 163, 424 P.2d 715]; *People v. Montano* (1991) 226 Cal.App.3d 914, 937-940 [277 Cal.Rptr. 327] (*Montano*) [invalidating *Mirandized* confession given at second custodial interrogation initiated by the defendant, following his inadmissible confession at earlier interrogation]; *People v. Harris* (1989) 211 Cal.App.3d 640, 650-651 [259 Cal.Rptr. 462]; *People v. Underwood* (1986) 181 Cal.App.3d 1223, 1233 [226 Cal.Rptr. 840]; see also Note, *Miranda Right-to-Counsel Violations and the Fruit of the Poisonous Tree Doctrine* (1987) 62 Ind. L.J. 1061 [noting distinction between mere failure to read suspect his *Miranda* rights, and later violating those rights once he tries to invoke them].)

In *Sims,* we addressed a similar situation, stating the applicable rules as follows: "Previous decisions have acknowledged that where—as a result of improper police conduct—an accused confesses, and subsequently makes another confession, it may be presumed the subsequent confession is the product of the first because of the psychological or practical disadvantages of having ' "let the cat out of the bag by confessing." ' [Citations.] Notwithstanding this presumption, 'no court has ever "gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed." ' [Citations.] Thus, the foregoing presumption is rebuttable, with the prosecution bearing the burden of establishing a break in the causative chain between the first confession and the subsequent confession. [Citations.]" (*Sims, supra,* 5 Cal.4th at pp. 444-445.)

*Sims* continued by observing that "[a] subsequent confession is not the tainted product of the first merely because, 'but for' the improper police conduct, the subsequent confession would not have been obtained. [Citation.] As the United States Supreme Court has explained: '[N]ot . . . all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." ' [Citations.] The degree of attenuation that suffices to dissipate the taint 'requires at least an intervening independent act by the defendant or a third party' to break the causal chain in such a way that the second confession is not in fact obtained by exploitation of the illegality. [Citations.]" (*Sims, supra,* 5 Cal.4th at p. 445.)

The *Sims* court concluded the defendant's subsequent statements in that case were "sufficiently attenuated" from the earlier interrogation so as to be free of the taint of the earlier impropriety: The subsequent confession was

elicited only after *defendant unilaterally initiated* further communication the following day, specifically requesting to speak with the officers. *(Sims, supra,* 5 Cal.4th at pp. 445-446.) Furthermore, before the renewed interrogation occurred, the defendant in *Sims* was *readvised of his Miranda rights,* and he expressly waived those rights, "thereby further dissipating any taint of the improper police conduct that had occurred the preceding day. (See *Oregon v. Elstad* (1985) 470 U.S. 298 [105 S.Ct. 1285, 84 L.Ed.2d 222] [*(Elstad)*].)" *(Sims, supra,* 5 Cal.4th at p. 446.) Neither of these circumstances was present here.

The majority in the present case argues that *Sims*'s "tainted product" analysis has been called in question by the high court's decision in *Elstad.* Not so. First, *Sims* was well aware of *Elstad* and cited it in its opinion. *(Sims, supra,* 5 Cal.4th at p. 446.) Second, *Elstad* expressly limited its holding to *unwarned* statements and indicated the rule might well be different if the police had exacted a confession *after improperly ignoring the suspect's requests for counsel.* (See *Elstad, supra,* 470 U.S. at pp. 312-313, fn. 3 [105 S.Ct. at p. 1295].) The majority, relying on *People v. Bradford* (1997) 14 Cal.4th 1005 [60 Cal.Rptr.2d 225, 929 P.2d 544] *(Bradford),* suggests that *Sims*'s "tainted product" analysis has been replaced by a simple "voluntary confession" test that asks whether, despite the initial *Miranda* violation, the subsequent confession was knowingly and voluntarily given.

In *Bradford, supra,* 14 Cal.4th at page 1040, relying on *Elstad, supra,* 470 U.S. at page 309 [105 S.Ct. at page 1293], we qualified *Sims* by observing that "if the statement made after an *Edwards* [*(Edwards, supra,* 451 U.S. 477)] violation is voluntary, 'the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.' [Citation.]" We noted that *Sims* had used a more stringent "'tainted product'" analysis, but we stated that after *Elstad* "it is not necessary to do so when the statement immediately following the *Edwards* violation is voluntary." *(Bradford, supra,* 14 Cal.4th at p. 1041, fn. 3.)

Relying on *Bradford* and *Elstad,* the majority assumes that the "poisonous tree" and "cat-out-of-the-bag" doctrines have no application to *Miranda* violations. (See *People v. Carpenter* (1999) 21 Cal.4th 1016, 1040 [90 Cal.Rptr.2d 607, 988 P.2d 531] [acknowledging but not deciding issue].) As we noted in *Bradford, supra,* 14 Cal.4th at pages 1039 to 1041, *Elstad* did question whether these Fourth Amendment doctrines necessarily applied to every police interrogation in violation of *Miranda.* (See *Elstad, supra,* 470 U.S. at pp. 306-313 [105 S.Ct. at pp. 1291-1296].) But *Elstad*'s actual holding is not so broad as the majority assumes. *Elstad* merely held that a suspect who has once incriminated himself in response to "unwarned" but

uncoercive questioning is not thereby forever disabled from waiving his rights and confessing "after he has been given the requisite *Miranda* warnings." (*Elstad, supra,* 470 U.S. at p. 318 [105 S.Ct. at p. 1298]; see *People v. Samayoa* (1997) 15 Cal.4th 795, 831 [64 Cal.Rptr.2d 400, 938 P.2d 2] ["admissions made pursuant to full *Miranda* waivers may not be suppressed because of prior *Miranda* violations unless the later admissions were *in fact* involuntary*,*" citing *Elstad*].) In other words, in *Elstad,* the high court deemed that the proper and timely administration of these warnings presumably would disperse any lingering coercive pressures on the suspect arising from his initial unwarned statement. (*Elstad, supra,* 470 U.S. at pp. 311-314 [105 S.Ct. at pp. 1294-1296].)

As *Elstad* stated, "It is an unwarranted extension of *Miranda* to hold that *a simple failure to administer warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will,* so taints the investigatory process that a subsequent voluntary *and informed* waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." (*Elstad, supra,* 470 U.S. at p. 309 [105 S.Ct. at p. 1293], italics added.)

Significantly, the majority in *Elstad* expressly distinguished cases involving continued interrogation after a request for counsel, suggesting the rule would be different in such a case. (*Elstad, supra,* 470 U.S. at pp. 312-313, fn. 3 [105 S.Ct. at p. 1295].) As the *Elstad* majority observed "inapposite are the cases the dissent cites concerning suspects whose invocation of their rights to remain silent *and to have counsel present* were flatly ignored while police subjected them to continued interrogation. [Citations.]" (*Id.* at p. 313, fn. 3 [105 S.Ct. at p. 1295], italics added.) Accordingly, I seriously question *Bradford*'s suggestion that, following *Elstad,* continued interrogation after invocation of right to counsel is not "inherently" coercive. (*Bradford, supra,* 14 Cal.4th at pp. 1039-1040.)

We have uncovered several cases from other states that support the foregoing conclusion regarding *Elstad* and its limits. (*State v. Hartley* (1986) 103 N.J. 252 [511 A.2d 80, 90-93]; *State v. Crump* (Tenn. 1992) 834 S.W.2d 265, 270-271; cf. *State v. Fuller* (1990) 118 N.J. 75 [570 A.2d 429].) In *Hartley,* for example, the New Jersey Supreme Court, in a well-reasoned opinion, stressed the important "qualitative difference" between a mere failure to give *Miranda* warnings and a failure to honor them once the suspect has attempted to assert them. (*Hartley, supra,* 511 A.2d at pp.

90-91.) *Hartley* carefully analyzed *Elstad* and explained that its holding was inapplicable to cases involving suspects whose invocation of their *Miranda* rights was flatly ignored while police continued to interrogate them. (*Hartley, supra,* at pp. 92-93.) *Hartley* likewise recognized that *Elstad*'s reluctance to apply the "cat-out-of-the-bag" principle was limited to cases involving mere failures to give *Miranda* warnings and not actual refusals to honor the invocation of those rights. (*Hartley, supra,* at pp. 96-97.)

The majority's analysis is not only unsupported by the pertinent case law, but it is wholly unacceptable as a rule of law because it removes any incentive on the part of law enforcement officers to comply with *Miranda* and *Edwards* by terminating the initial interrogation once the suspect requests counsel. Henceforth, thanks to today's holding, police officers will have carte blanche to ignore *Miranda/Edwards*, having nothing to lose, and a useable confession to gain, if they simply disregard the suspect's requests for counsel, continue until they procure an unlawful confession, terminate the interrogation, and resume it soon thereafter in a supposedly "noncustodial" setting, without giving the suspect the benefit of fresh *Miranda* warnings.

We would be naive to assume that law enforcement agencies will not take advantage of the new evidentiary door the majority's holding would helpfully open for them. As Justice Brown observed in her concurring and dissenting opinion in a recent search and seizure case, "[f]rom what we know of human nature, this observation seems unassailable: for every inch given, a mile will be taken." (*People v. McKay* (2002) 27 Cal.4th 601, 628 [117 Cal.Rptr.2d 236, 41 P.3d 59] (conc. & dis. opn. of Brown, J.); see also *U.S. v. Orso* (9th Cir. 2001) 275 F.3d 1190, 1194, 1196-1197 (dis. opn. of Trott, J.) (*Orso*).)

As Judge Trott explained in his dissent in *Orso,* involving a suspect who was tricked by police into making an unwarned statement followed shortly by a warned one, by reason of the *Orso* majority decision, "the practice of purposefully interrogating a suspect without advising her of her rights may become commonplace. The message from *Orso* will resonate far and wide: violate the Constitution, do so intentionally, flout the dictates of the Supreme Court, and nevertheless, the targeted plunder of your purposefully lawless behavior can be used against the victim of the glaring official transgression." (*Orso, supra,* 275 F.3d at p. 1194 (dis. opn. of Trott, J.).)

Judge Trott continued by observing that "[a]fter our limited en banc court's decision, there will be reduced incentive for trainers to instruct students at the academies to comply with *Miranda*. Rather, *Orso* provides

strong incentive for law enforcement to ignore *Miranda,* interrogate a suspect without overbearing her will, and then rely on *Orso* to sanitize the transgression. [¶] Indeed, *Orso* provides bullet-proof armor to—and may embolden—some determined police trainers who have for years sought to circumvent *Miranda* with impunity. See Charles D. Weisselberg, *In the Stationhouse after Dickerson,* 99 Mich. L.Rev. 1121 (2001) (cataloging myriad ways police have devised over the years to defeat *Miranda*)." (*Orso, supra,* 275 F.3d at p. 1196 (dis. opn. of Trott, J.).) Predictably, the majority's holding in the present case will provide even stronger disincentives to complying with *Miranda.*

Let me stress what the present case is *not* about. This is not a case, such as *Orso* or *Elstad,* involving mere failures to give *Miranda* warnings, or even a failure to terminate questioning once the suspect had invoked his right to remain silent. In this case, the officers exacted defendant's initial confession *after he had requested the assistance of counsel,* a far more serious violation of defendant's constitutional rights, and one which the high court in *Elstad* expressly found beyond the scope of its holding (see *Elstad, supra,* 470 U.S. at pp. 312-313, fn. 3 [105 S.Ct. at p. 1295]). In my view, we must recognize and deal with the taint arising from the earlier unlawful confession. Although the cat-out-of-the-bag cliché may seem trite, it also seems quite apt here, for defendant certainly would not have so readily confirmed his earlier confession had he never made it in the first place, and he never would have made it had the officers honored his initial request for counsel and terminated their interrogation.

I do not propose a rule that would forever bar police from reinitiating an interrogation once a break in custody has occurred. The correct test, under *Sims, supra,* 5 Cal.4th at pages 444-445, is whether any intervening independent act occurred sufficient to dissipate the taint of the earlier interrogation and demonstrate that the second confession was indeed knowing and voluntary. A reasonably long break in custody would be a relevant factor. So would the fact that the suspect initiated the interview, or that the officers gave fresh *Miranda* warnings, including the right to counsel's presence, before the interview commenced. Various other factors are likewise relevant to the inquiry. But the mere fact the reinterrogation occurred in a noncustodial setting should be only one such factor in the voluntariness equation, not the conclusive one.

Here, the "voluntariness factors" strongly point to a finding of involuntariness as a matter of law. Under the circumstances here, including defendant's repeated and unavailing requests for counsel during his initial interview, his highly incriminating and inadmissible statements made at that

time, and the subsequent failure to readvise him, the subsequent resumption of interrogation two days later clearly was strategically aimed at gathering new, admissible incriminatory statements in a supposedly noncustodial setting without readmonishing defendant of his right to counsel. Having already "let the cat out of the bag" regarding his wife's murder, defendant's subsequent admissions to the officers, made without the benefit of fresh *Miranda* warnings, should be deemed either involuntary (see *Bradford, supra,* 14 Cal.4th at p. 1040) or the tainted fruit of the poisonous tree (*Sims, supra,* 5 Cal.4th at pp. 444-447).

Moreover, the record shows no intervening independent act sufficient to dissipate the taint of the earlier interrogation or break the causal chain, or the "inherent pressures" arising from the initial *Miranda* violation, so that we may say with confidence that defendant's second confession was voluntary and not obtained by exploiting his earlier admissions. Although the subsequent interview occurred in defendant's home rather than at the police station, it occurred only two days after the earlier interrogation, and the record fails to indicate that in the meantime defendant had contacted an attorney or conferred with friends or family. (See *Montano, supra,* 226 Cal.App.3d at pp. 937-939 [stressing importance of such factors as (1) the giving of renewed *Miranda* warnings, (2) the temporal proximity of the unlawful coercive police tactics and the new confession, (3) the presence of intervening circumstances such as the defendant's initiation of renewed contact or his ability to consult with an attorney or others, and (4) the officers' purpose to secure an admissible confession]; see also *People v. Beardslee, supra,* 53 Cal.3d at p. 109.) Each of the *Montano* factors tends to lead to the conclusion that the challenged statement was involuntary and illegally obtained.

As stated in *Montano, supra,* 226 Cal.App.3d at page 939, "Based on the circumstances detailed above, the psychologically coercive illegalities of the first interrogation were the motivating cause of the damaging admissions, and of the subsequent confession. [Citations.]" (See also *Minnick v. Mississippi* (1990) 498 U.S. 146, 153 [111 S.Ct. 486, 491, 112 L.Ed.2d 489] [subsequent consultation with counsel is no substitute for presence of counsel at interrogation]; Shapiro, *supra,* 53 Okla. L.Rev. at p. 32 ["a break in custody followed by reapprehension and the resumption of custodial interrogation would be examined for its potentially ameliorative or coercive effects, and only if the sequence of events was *in fact* sufficiently likely to have dissipated coercive influences would the presumption [of continuing coercion] be rebutted"]; Strauss, *supra,* 22 Hastings Const. L.Q. 389-390 [criticizing break-in-custody rule as based on false assumption that release from custody actually relieves defendant from coercive pressures].)

Because I believe the taint of the officers' *Miranda* violation continued unabated during the supposed noncustodial interview on November 21, I conclude that defendant's further incriminatory statements confirming his previous inadmissible confession were the tainted fruit of the initial interrogation. As I have observed, the majority's contrary holding will render wholly ineffective the prophylactic protections afforded by *Miranda/Edwards*, eliminating any inducement on the part of law enforcement officers to comply with those decisions despite the suspect's request for counsel. Accordingly, I would reverse the judgment of the Court of Appeal.

George, C. J., concurred.