Filed 1/8/14  P. v. Carrillo CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>OSCAR ALEJANDRO CARRILLO,<br><br>        Defendant and Appellant. | A136363<br><br><br>(Contra Costa County<br>Super. Ct. No. 05-111408-1) |

Oscar Alejandro Carrillo appeals from a judgment of conviction and sentence imposed after a jury found him guilty of murder.  (Pen. Code, § 187.)  He contends that his statements to police were obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) and should have been suppressed.  We will affirm the judgment.

## I.        FACTS AND PROCEDURAL HISTORY

An information charged Carrillo with murder and alleged that he personally used and discharged a firearm in the commission of the offense (Pen. Code, §§ 187, 12022.53, subds. (b)–(d)).  Carrillo entered a plea of not guilty and denied the firearm enhancement.

Carrillo filed a motion to suppress evidence of statements he made to the police.  After an evidentiary hearing discussed *post*, the court denied the motion.  The matter proceeded to a trial by jury.

A.        *Evidence at Trial*

Carrillo and victim Jose Marroquin trained as boxers at an Oakland gym with trainer Pablo Perez.  Carrillo, Marroquin, and Perez usually drove to the gym together.

1

Ruth Aguilera also trained with Perez at the gym. Carrillo told Marroquin that he liked Aguilera. Carrillo had asked Aguilera out, but she declined his invitations. In March 2011, Aguilera started dating Marroquin instead of Carrillo.

On March 23, 2011, Carrillo saw Marroquin and Aguilera hugging and kissing in a parking lot across the street from the gym. Aguilera observed Carrillo looking at her; he appeared mad and upset, which made Aguilera uncomfortable.

That evening, Marroquin drove Carrillo and Perez home. Carrillo seemed upset and did not say goodbye when he got out of the car. As Perez went inside his house, he saw Marroquin and Carrillo talking and arguing. That same evening, Marroquin told Aguilera that Carrillo had appeared upset and said that Marroquin had made him look like a fool.

On March 24, 2011, Marroquin told a friend, Raul Ventura, that he did not go to the gym that day because he was afraid. Marroquin explained that he had a problem with Carrillo, because Carrillo discovered Marroquin was "hanging out" with Aguilera. Marroquin seemed scared, nervous, and worried. Marroquin also said that, when he told Carrillo that Aguilera did not want to be with Carrillo, Carrillo told him to be careful because Carrillo did not "know what's going to happen."

On March 25, 2011, Marroquin agreed to pick up Perez at 5:00 p.m. to go to the gym. Around 5:00 p.m., Perez received a call from Marroquin, who sounded normal and said he had arrived. In about five or 10 minutes, Perez came out of his house and found Marroquin in his car, unresponsive, with blood on his temple. Perez told his son to call the police.

The police found Marroquin slumped in the driver's seat, with a gunshot wound to his head. A spent .40-caliber cartridge was on or beneath the driver's seat headrest, and a bloody spent projectile was on the dashboard. The autopsy revealed a gunshot entry wound to the base of Marroquin's skull, and an exit wound over his left ear, indicating a bullet path from Marroquin's right to his left, back to front, and upward. Marroquin died as the result of the gunshot wound.

2

Richmond Police Detective Timothy Gray interviewed Carrillo after the shooting. In videotaped interviews on March 29 and April 1, 2011, Carrillo denied any involvement in the shooting. During the April 1 interview, however, Carrillo became agitated when Gray pressed him on issues concerning Aguilera and Marroquin.

A search warrant was executed on Carrillo's home on April 7, 2011. Police found .40-caliber ammunition, among other items, in Carrillo's bedroom.

On April 8, 2011, Detective Gray interviewed Carrillo again. In this interview—the subject of Carrillo's suppression motion—Carrillo told Gray that he killed Marroquin. Specifically, Carrillo stated that he drove to Perez's house on the afternoon of the shooting and waited until Marroquin arrived. He then got in the rear seat of Marroquin's car and said, "let me show you something," displaying a .40-caliber Taurus Millennium semi-automatic handgun. Marroquin became "stressed," but Carrillo told him not to worry and he would unload the gun. As Carrillo began to unload the weapon, Marroquin was talking on his cell phone. Carrillo removed the clip from the gun, but when he attempted to remove the bullet from the chamber, "it slipped" and the gun went off. At this point, Carrillo did not know what to do, so he left Marroquin, got in his own car, went to a restaurant and had dinner, and then went home. On his way home, he threw his gun in the water near the Berkeley Marina. Carrillo denied having an argument or issue with Aguilera or Marroquin, and he claimed that he had the gun with him because he usually carried it, not because he intended to shoot Marroquin. Carrillo also claimed that he did not come forward about shooting Marroquin because he was scared and embarrassed.

B.    *Verdict and Sentence*

The jury found Carrillo guilty of first degree murder and found the firearm enhancement allegation true. The court sentenced Carrillo to 25 years to life on the murder count plus a consecutive 25 years to life for the firearm enhancement. This appeal followed.

3

## II.    DISCUSSION

Carrillo contends that a statement he made to Detective Gray at the police station doorway (which was not introduced at trial), and his subsequent statement to Gray in the interrogation room (which was introduced), should have been suppressed under *Miranda* and its progeny.  We first summarize the evidence and the ruling at the suppression hearing, and then consider each of Carrillo's statements in light of the relevant legal principles.[1]

A.    *Suppression Hearing*

1.    *Detective Gray's Testimony*

Detective Gray testified that on March 28, 2011 (three days after Marroquin was shot), he called Carrillo and asked him to come to the police department to discuss the shooting.   Carrillo appeared at the police station the next day.  He denied being at the scene of Marroquin's shooting and denied any involvement in his death.  At the end of the 15- to 20-minute interview, Gray escorted Carrillo from the interview room and out of the police station through a set of unsecured glass doors.  Carrillo does not claim his *Miranda* rights were violated by this contact.

On April 1, 2011, Detective Gray again asked Carrillo to come to the police station and discuss Marroquin's death and his prior statement.  During this second interview, Carrillo was specifically told that he was not under arrest.  He again denied any involvement in Marroquin's killing.  At the end of the interview, which lasted over an hour, Gray escorted Carrillo from the interview room and out the unsecured glass exit doors.  Carrillo does not claim his *Miranda* rights were violated by this contact either.

On April 7, 2011, Detective Gray executed a search warrant on Carrillo's residence.  In Carrillo's bedroom, Gray located "large amounts of suspected

---

[1] Because the suppression motion addressed both statements, and because the admissibility of the interrogation room statement could be affected by whether the doorway statement was obtained in violation of *Miranda*, we address both statements even though the interrogation room statement was the only one introduced at the trial.

4

marijuana," a gym bag containing needles and apparent steroids, and .40-caliber ammunition—the same caliber as the bullet that killed Marroquin. Carrillo arrived at (or approached) his residence during the search, was arrested for possession of marijuana, and was transported to the police station.

At the police station, Carrillo was booked on the marijuana charge. Detective Gray informed Carrillo that he was under arrest for possession of marijuana and began the interview. Intending to interview Carrillo about the marijuana, Gray advised Carrillo of his *Miranda* rights. Carrillo invoked his right to counsel, and Gray ceased questioning. The interview lasted three minutes or less, and Gray took Carrillo to the jail inside the police station.

The following day (April 8, 2011), around 10:30 a.m., Detective Gray decided to release Carrillo pending the results of the crime lab's testing of the suspected marijuana, because it would have been difficult to file charges until those results were received. Gray therefore removed Carrillo from his jail cell and walked him to a small storage area, which was used to process inmates for release, within the secured portion of the jail. Gray filled out paperwork with Carrillo, who was not in handcuffs, and told Carrillo he was being released and he was not being charged for possession of marijuana at that time. (Carrillo had not been told he was under arrest for any other offense either.) Carrillo appeared relieved and signed the release form and a receipt for money taken from him when he was booked.

At one point, Carrillo asked Detective Gray how much time someone would serve for a marijuana arrest; Gray replied that he did not know and could not talk about it because Carrillo had asked for a lawyer. They then "talked about a lot of things," including fishing, exercise, boating, and Carrillo's children, for about five to 10 minutes. During this conversation, Carrillo volunteered statements to Gray, as opposed to merely responding to questions from Gray.

Detective Gray then escorted Carrillo out of the storage room and the secured jail area, down a 90-foot hallway, to the unsecured glass door exit. Along the way, they continued to engage in small talk, but Gray did not touch or exercise physical control

5

over Carrillo. When they reached the exit doors, Gray leaned up against a door so it was partially open, and they continued their general conversation; Gray had reminded Carrillo that he had no obligation to talk to Gray, he was not under arrest, and he was going home.[2]

At this point, it appeared to Detective Gray that something was wrong with Carrillo: he appeared somber, there was a softness in his voice, and his eyes appeared glassy at times. Gray asked Carrillo if everything was okay (or "what's wrong?"). Gray also told Carrillo that it looked like he had something on his mind, and he asked Carrillo if he could help or if Carrillo had any questions for him. By this inquiry, Gray testified, he did not intend to elicit incriminating information from Carrillo.

Carrillo paused for over 30 seconds, and then said it was an accident and he was trying to clear the gun and the gun went off. This statement occurred about 20 to 30 minutes after the paperwork for Carrillo's release had been completed.

Detective Gray suspected that Carrillo was referring to the shooting of Marroquin and stopped him from speaking further. Gray told Carrillo that he did not want Carrillo to say anything Carrillo was not supposed to, he wanted to make sure Carrillo's rights were protected, and he wanted to make sure Carrillo understood that he had the right not to speak to Gray. Carrillo acknowledged that he understood his rights, and he stopped speaking.

Detective Gray escorted Carrillo to an interview room. Carrillo was quiet and seemed sad; he was "kind of crying, tearing up a little bit." At 12:50 p.m., Gray commenced the interview, explaining that he was investigating Marroquin's shooting. Gray read Carrillo his *Miranda* rights, and Carrillo acknowledged that he understood

---

[2] It is not clear from Detective Gray's testimony whether this admonition occurred at the doorway, in the hallway between the storage area and the doorway, in the storage area, or in some or all of these locations. The upshot is that Gray made these statements to Carrillo on at least one occasion in the midst of their several minutes of small talk, before Carrillo made the doorway statement that he presently challenges.

them. Carrillo again told Gray that he shot Marroquin accidentally, but he denied intending to kill Marroquin.

2.     *Trial Court's Ruling*

The trial court denied Carrillo's suppression motion, finding that Detective Gray had not gone to the police department on April 8, 2011, to question Carrillo about the homicide, but to release him on the marijuana charge, and that Gray took Carrillo to the storage room in the interest of privacy. The court believed Gray was credible when he testified that he was concerned about Carrillo's welfare, and the court noted it was apparent from the videotapes of Carrillo and Gray that there was a "camaraderie" and "easy flow" between them. The court found that Carrillo was no longer in custody—and clearly not in custody on the homicide—when he made the statement to Gray at the doorway. The court further found that Gray's statements were not meant to elicit an incriminating response, and Carrillo's statement was spontaneous.

We review factual findings for substantial evidence and legal rulings de novo. (*People v. Waidla* (2000) 22 Cal.4th 690, 730.)

B.     *Carrillo's Statement in the Police Station Doorway*

*Miranda* protections apply only to custodial interrogations. (*Miranda*, *supra*, 384 U.S. at p. 444 ["the prosecution may not use statements, whether exculpatory or inculpatory, stemming from *custodial interrogation* of the defendant unless it demonstrates the use of procedural safeguards" (italics added)]; *People v. Ochoa* (1998) 19 Cal.4th 353, 401 [" '[a]bsent "custodial interrogation," *Miranda* simply does not come into play' "].)

Here, Carrillo was not in custody, nor was he subjected to interrogation, when he told Detective Gray at the police station door that the gun went off accidentally.

1.     *Carrillo's Statement Was Not Made While in Custody*

For purposes of *Miranda*, an interrogation is "custodial" if it occurred in a situation " ' "in which 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " ' " (*People v. Ochoa, supra,* 19 Cal.4th at p. 401; see *People v. Storm* (2002) 28 Cal.4th 1007, 1037 (*Storm*)

7

["*Miranda* procedures apply only in the custodial setting"].) The essential question is "whether 'a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.' " (*People v. Ochoa*, at p. 402.)

In the matter before us, a reasonable person would have felt free to stop the conversation with Detective Gray, and continue walking out the open police station doors, when Gray asked Carrillo if anything was wrong or if he had a question. By this time, Gray had informed Carrillo that he was being released without being charged, and the paperwork for the release had already been completed. Gray had told Carrillo that he did not have to talk to him. Carrillo was not in handcuffs, and Gray did not make physical contact with Carrillo during their walk out of the secured police area and down the hallway to the exit. Their conversation between the time the release papers were signed and the time Gray asked about Carrillo's welfare was merely small talk, was not for the purpose of questioning Carrillo about the shooting or any other charge, did not suggest any law enforcement belief that Carrillo was culpable, lasted only a few minutes, and was mutual in the sense that Carrillo was not merely responding to Gray's questions. There is no indication that Gray was aggressive, confrontational, or accusatory. Gray's questions about Carrillo's welfare took place at the public doors to the police station, which were not secured—and, in fact, were partially open—after Gray advised Carrillo that he was no longer under arrest and was able to go home. Under these circumstances, a reasonable person would have felt free to leave, without responding to Gray's inquiry into his welfare. (See generally *People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1162 [discussing factors relevant to whether interrogation was custodial]; *California v. Beheler* (1983) 463 U.S. 1121, 1125 [fact that interview took place at a police station was not determinative; "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest"].)

Because Carrillo was not in custody, there was no *Miranda* violation.

8

2.      *Carrillo's Statement Was Not in Response to Interrogation*

"[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any *words or actions* on the part of the police (other than those normally attendant to arrest and custody) *that the police should know are reasonably likely to elicit an incriminating response* from the suspect." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301, italics added & fns. omitted.)  The issue is not the officer's subjective intent, but instead involves an objective assessment of "the total situation . . . by considering such factors as the length of the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the police and all other relevant circumstances." (*People v. Stewart* (1965) 62 Cal.2d 571, 579.) " 'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." (*Rhode Island v. Innis*, at p. 300, fn. omitted.)

Here, the totality of the circumstances indicates that Detective Gray's words to Carrillo—at the open doorway to the street after Carrillo had received his release papers and been told he was free to leave—were not reasonably likely to elicit an incriminating response.  Gray merely observed that it looked like something was on Carrillo's mind and asked him whether he was okay, what was wrong, if he had questions, and whether Gray could help.  This inquiry was innocuous, especially in light of its context.  Given Carrillo's two prior denials of involvement in Marroquin's death, the fact that Carrillo's most recent incarceration and questioning pertained not to Marroquin's killing but to Carrillo's marijuana, the fact that they had engaged in mutual small talk for the last several minutes, and Carrillo's freedom to walk out the police station door, Gray would not have reasonably expected that asking Carrillo if he was alright would result in an incriminating admission about Marroquin's case.  It cannot be said that Gray should have known that it was reasonably likely Carrillo would confess to his participation in the shooting of Marroquin.

9

For this reason as well, there was no *Miranda* violation.[3]

3.      *Carrillo's Argument Based on* Edwards[4] *is Meritless*

Carrillo insists that whether he was in custody when Detective Gray asked about his well-being is immaterial, because there was not a long enough break in his "custodial status" to allow him to contact an attorney after asserting his right to counsel, and therefore Gray could not renew his questioning.  Essentially, Carrillo urges that a particular exception to a rule set forth in *Edwards, supra,* 451 U.S. 477, was not established; his argument fails, however, in that *Edwards* does not apply to Carrillo's statement at the police station door anyway, since the statement did not arise in the context of custodial interrogation.[5]

In *Edwards*, the defendant invoked his right to counsel on the first day of interrogation.  The next day, the police interrogated him again, and this time he waived his *Miranda* rights and made incriminating statements.  (*Edwards, supra,* 451 U.S. at pp. 478–479.)  The court held that the defendant's *Miranda* waiver was not valid because the police had not made counsel available in response to his initial invocation, and the defendant was not the one who suggested the second interrogation or otherwise initiated further communication with police.  (*Id*. at pp. 484–485.)  The court concluded: "an accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further *interrogation* by the authorities until counsel has been made available to him."  (*Ibid*., italics added.)  The *Edwards* rule was intended to protect the

---

[3] We also note, as a corollary to the fact that Detective Gray's questions were not in the context of custodial interrogation, that Carrillo's statement at the police station door was voluntary:  he was free to leave and took over 30 seconds to respond to Gray's inquiry about his welfare.  "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding . . . ."  (*Miranda*, *supra*, 384 U.S. at p. 478.)

[4] *Edwards v. Arizona* (1981) 451 U.S. 477.

[5] For reasons discussed *post*, *Edwards* does not apply to Carrillo's subsequent statement in the interview room either.

10

*Miranda* rule by preventing law enforcement from badgering a defendant to get him to waive his rights. (*Michigan v. Harvey* (1990) 494 U.S. 344, 350.)[6]

In so ruling, *Edwards* made it clear that it was barring continued *custodial interrogation* of an accused, initiated by the police, after the accused's invocation of the right to counsel. The court held: "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further *police-initiated custodial interrogation* even if he has been advised of his rights." (*Edwards, supra*, 451 U.S. at p. 484, italics added & fn. omitted.) The court further explained: "The Fifth Amendment right identified in *Miranda* is the right to have counsel present at any *custodial interrogation*. Absent such interrogation, there would have been no infringement of the right that [the defendant] invoked . . . ." (*Id*. at pp. 485–486, italics added.)

Here, the exchange between Detective Gray and Carrillo at the police station door was *not* a custodial interrogation, for reasons discussed *ante*. *Edwards* does not apply.

In *Minnick v. Mississippi* (1990) 498 U.S. 146 (*Minnick*), the accused invoked his right to have a lawyer on the first day of interrogation, and the interrogation ceased. While still in custody, he met with a lawyer. Two days later, while still in custody, the accused was told that he had to answer the sheriff's questions. During the ensuing custodial interrogation, the defendant confessed without a lawyer present. (*Id*. at pp. 148–149.) The court stated: "[W]hen counsel is requested, interrogation must cease, and officials may not reinitiate *interrogation* without counsel present, whether or not the accused has consulted with his attorney." (*Id*. at p. 153, italics added.) As Carrillo notes, *Minnick* justified this extension of the *Edwards* rule because "[a] single consultation with an attorney does not remove the suspect from persistent attempts by officials to persuade

---

6 The *Edwards* rule was expanded in *Arizona v. Roberson* (1988) 486 U.S. 675, 677, 683, such that an accused's invocation of *Miranda* rights when interrogated as to one charge also precludes custodial interrogation as to a different charge unless counsel is present. The court in *Roberson* emphasized that the accused was in continuous custody. (*Id*. at p. 686.)

11

him to waive his rights, or from the coercive pressures that accompany *custody* and that may increase as *custody* is prolonged." (*Ibid.*, italics added.)

Again, Carrillo was not in custody during his exchange with Detective Gray at the police station door, so *Minnick* does not apply.

An exception to the *Edwards* no-recontact rule—which Carrillo now raises and then tries to negate—was recognized in *In re Bonnie H.* (1997) 56 Cal.App.4th 563. There, the police questioned an arrested defendant in regard to a murder, she requested an attorney after being read her *Miranda* rights, the questioning stopped, and she was released. (*Id.* at p. 566.) Six weeks later, the defendant was rearrested for the same crime, waived her *Miranda* rights, and made incriminating statements. (*Id.* at pp. 566–567.) The court held that the statement was admissible notwithstanding *Edwards*, because there had been a good faith break in custody before she waived her rights. (*Id.* at pp. 583–584; see also *McNeil v. Wisconsin* (1991) 501 U.S. 171, 177 [once a suspect in custody invokes *Miranda*, subsequent statements to police are inadmissible if obtained pursuant to "an encounter [initiated by the police] in the absence of counsel (*assuming there has been no break in custody*)" (italics added)].)

Although *In re Bonnie H.* held that a statement made during police-initiated custodial interrogation did not run afoul of *Edwards*, by no means did it insinuate that *Edwards* would bar a statement made (as here) during a noncustodial conversation, no matter how long it had been since the defendant had been released from custody. *In re Bonnie H.* does not support Carrillo's argument.

Carrillo's reliance on *Storm, supra,* 28 Cal.4th 1007 is similarly misplaced. In *Storm*, the accused was being investigated in connection with his wife's death. He agreed to take a polygraph test but, at the police station, said he wanted to consult an attorney first. Rather than ceasing questioning and honoring that request, the polygraph examiner encouraged him to continue talking, and he admitted killing his wife. He was then released. Two days later, the police reinterviewed the accused at his home with his permission, assuring him that he would not be arrested, without giving him new *Miranda*

12

warnings. The defendant provided additional information about killing his wife. (*Id*. at p. 1012.)

Our Supreme Court assumed that the accused's statement while in custody at the police station was obtained in violation of *Miranda* and *Edwards*. (*Storm, supra*, 28 Cal.4th at p. 1022, fn. 5.) But as for the statement at his home, the high court agreed with the Court of Appeal that the *Edwards* no-recontact rule did not apply, because there had been a break in custody sufficient for the accused to consult with counsel, and police may lawfully recontact the accused after such a break. (*Id*. at pp. 1023–1024.) Furthermore, the court emphasized the limited scope of the *Edwards* no-recontact rule: "The special protections of *Miranda* and *Edwards* apply only to persons questioned in the coercive atmosphere of *police custody*. The *Edwards* no-recontact rule guards against police badgering designed to wear down a suspect who *remains in custody* after invoking his *Miranda* right to counsel during custodial questioning." (*Id*. at pp. 1012–1013.) The court further explained: "While the [United States Supreme Court] has never directly addressed whether a break in custody vitiates the *Edwards* no-recontact rule, California cases uniformly have held or assumed that the rule barring police recontact after a *Miranda* request for counsel *applies only during continuous custody*. [Citations.]" (*Id*. at p. 1023, final italics added & fn. omitted.)

Here, the *Edwards* no-recontact rule did not apply to the exchange between Detective Gray and Carrillo at the police station door, because Carrillo was not then the subject of custodial interrogation. Because the *Edwards* no-recontact rule did not apply, whether the *In re Bonnie H*. exception to the *Edwards* rule applies (based on a break in custody) is immaterial.

In the final analysis, Carrillo's statement to Detective Gray at the doorway of the police station, to the effect that he shot Morriquin by accident, was not obtained in violation of *Miranda* or its progeny. Carrillo has not established that the court erred in denying his suppression motion in this regard.

13

C.      *Carrillo's Subsequent Statement*

After Carrillo told Detective Gray at the police station doorway that he in effect shot Marroquin by accident, Gray took Carrillo to an interview room, read Carrillo his *Miranda* rights, and obtained Carrillo's acknowledgement that he understood those rights. Carrillo's subsequent statement, introduced at trial, was not obtained in violation of *Miranda*.

Carrillo argues that the *Miranda* advisement and implied waiver in the interview room immediately before Carrillo's subsequent statement was vitiated by the *Miranda* or *Edwards* violation perpetrated earlier at the doorway to the police station. Because we conclude there was no *Miranda* or *Edwards* violation at the doorway, Carrillo's argument is unavailing.

Furthermore, Carrillo's subsequent statement was not obtained in violation of *Edwards* for yet another reason. Although his subsequent statement was in the context of custodial interrogation, it came about because Carrillo had first voluntarily brought up the topic of the shooting, while out of custody. *Edwards* does not apply where, as here, the subsequent custodial interrogation was not initiated by police, but by the accused. (*Edwards, supra*, 451 U.S. at pp. 484–485 [exception to no-recontact rule arises if "the accused himself initiates further communication, exchanges, or conversations with the police"]; *People v. Hayes* (1985) 169 Cal.App.3d 898, 909 ["*Miranda* does not proscribe a suspect from changing his mind concerning speaking to the police, when his change of heart is a voluntary one, based on factors that do not involve coercion by the police"].) Here, after Detective Gray reminded Carrillo that he was free to leave, held open the exit door, and asked Carrillo if anything was wrong, Carrillo paused for over 30 seconds before volunteering that the gun had fired accidentally. Carrillo's statement may be viewed as reflecting his desire to open a discussion of the shooting. (See *People v. Mickey* (1991) 54 Cal.3d 612, 648–649, 652 [no *Edwards* violation where accused first opened up a more general discussion relating directly or indirectly to the investigation before the police commenced the interrogation].)

Carrillo has failed to establish error.

14

### III.    DISPOSITION

The judgment is affirmed.

_____
NEEDHAM, J.

We concur.

_____
JONES, P.J.

_____
SIMONS, J.