Filed 6/18/21  P. v. Kimber CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>TYRELL DESHAWN KIMBER,<br><br>Defendant and Appellant. | F080889<br><br>(Kern Super. Ct. No. BF176735A)<br><br><br>**OPINION** |

### THE COURT*

APPEAL from a judgment of the Superior Court of Kern County.  John S. Somers, Judge.

Larenda R. Delaini, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

* Before Hill, P.J., Levy, J. and Poochigian, J.

## INTRODUCTION

Appellant and defendant Tyrell Deshawn Kimber was convicted after a jury trial of attempted residential burglary and sentenced to three years in prison. On appeal, his appellate counsel has filed a brief that summarizes the facts with citations to the record, raises no issues, and asks this court to independently review the record. (*People v. Wende* (1979) 25 Cal.3d 436 (*Wende*).) We affirm.

## FACTS

Around 8:30 p.m. on May 7, 2019, Robin Sellers and her young child were in their first-floor apartment in Bakersfield when someone rang the doorbell. Ms. Sellers did not answer the door. She looked through the front door's peephole and saw a person with a "manly shape." She watched the person from a window next to the front door, and he walked away.

A few minutes later, Ms. Sellers was in her living room and heard "wrestling" in the backyard, "like somebody walking around and moving stuff." She went into the kitchen and saw a shadow through the large screened window. Ms. Sellers testified the shadow belonged to a man, and she saw him reach for the kitchen window as if he was trying to push it open.

Ms. Sellers panicked and grabbed her phone, believing the man was about to break into the home. She ran to her child's bedroom and called her husband at work. He told her to call 911, and she did so.

Ms. Sellers testified she stayed on the phone with the 911 operator for about 10 to 12 minutes while waiting for the police to arrive. While she waited, she ran between the kitchen window and the bedroom, and tried to get her child to hide under the bed. She also kept watching the man to make sure he did not get in the residence.

As she continued to wait, Ms. Sellers heard something fall, and was afraid the man was about to get inside. Ms. Sellers grabbed her child, and they ran out the front door and went to a neighbor's house. The police arrived a few minutes later.

2.

Ms. Sellers testified the man tried to open the large kitchen window and the smaller window in the attached garage, which were adjacent to each other on the same side of the residence. The screen from the kitchen window had been completely removed and bent. After the police left, her husband discovered that the rod from the kitchen window had fallen off the rail and was on the ground, and the rod from the garage window fell off the track and was lying on the windowsill. They also discovered a few wooden slats from their backyard fence had been pulled off in the direction of the alley.

**Defendant's arrest**

Around 8:45 p.m., Officer Tramel arrived in the alley behind Ms. Sellers's home and walked toward the back of the residence. Tramel saw a man, later identified as defendant, standing in front of a window and using both hands to remove the screen. As Tramel approached, defendant looked directly at him. Tramel's flashlight illuminated defendant's face, and they made eye contact. Defendant ran away and jumped fences separating the backyards of the adjacent first floor apartments. Tramel identified himself as an officer and ordered him to stop, but defendant kept running. Officer Galdamez and his K9 partner had already arrived from the east side, and Galdamez also saw defendant jumping the fences and approaching him. Defendant saw Galdamez and his K9 partner, he froze, and Tramel arrested him.

Officer Tramel searched defendant, and he did not find any burglar tools, gloves, or bags. None of the windows were dusted for prints.

After he was taken into custody, defendant asked Officer Tramel for his keys and phone. Tramel found them in the backyard of one of the adjacent apartments where defendant jumped the fence.

Defendant's keys were for a 2008 Chrysler Sebring that was parked at the end of the alley, east of Ms. Sellers's apartment. Defendant's girlfriend responded to the scene, and Tramel gave her the keys because she needed the car for work.

3.

Ms. Sellers testified she did not get a good look at the man. She just saw all black, like he was wearing a long-sleeve hooded sweater with the hood over his head. When officers later asked if she could identify the suspect, Ms. Sellers replied that she was unable to do so and did not view the suspect. Ms. Sellers did not know defendant, and he did not have permission to enter her home.

**Defendant's statements**

Officers Galdamez and Didario testified they were present when defendant was questioned by Officer Moore. Defendant said that he was trying to enter the garage in order to take cans.

Officer Galdamez testified he used his body camera to take still photographs of the scene at Ms. Sellers's apartment and to record video of defendant's statements. Motorola provided the body camera equipment to the police department as part of a pilot program, but Motorola purged the camera's contents when the pilot program expired, and the police department decided not to use Motorola as the vendor.

Officer Moore testified that he spoke with defendant for about three minutes while defendant sat in a patrol car. He asked defendant what he was doing in the area. Defendant said he was going to remove recyclable cans from the garage, and he tried getting into the garage through the window.

**Defense evidence**

Officer Didario testified he spoke with Ms. Sellers that night, and she said someone knocked on the door and then tried to open the garage window. She did not say that someone tried to open the kitchen window. Ms. Sellers said the suspect was wearing a long-sleeve, dark colored shirt. She did not say he was wearing a sweater or had a hood over his head.

4.

Officer Didario inspected the garage window, noticed a layer of dust had been disturbed, and it looked like someone had tried to manipulate it. He also saw the broken slats on the backyard fence. Didario went inside the apartment and did not notice any rods in the kitchen window.

## PROCEDURAL BACKGROUND

On September 13, 2019, an information was filed in the Superior Court of Kern County charging defendant with count 1, residential burglary (Pen. Code, § 460, subd. (a));[1] count 2, misdemeanor resisting arrest (§ 148, subd. (a)(1)), and count 3, misdemeanor vandalism (§ 594, subd. (b)(2)(A)). As to count 1, it was alleged the offense was a violent felony because a person, other than an accomplice, was present during the residential burglary. (§ 667.5, subd. (c)(21).)

**Motions to exclude and dismiss**

On January 14, 2020, defendant's trial began with motions. Defendant filed a motion in limine to exclude all his pretrial statements because they were obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436.

Defendant also moved to dismiss the charges filed against him, pursuant to *California v. Trombetta* (1984) 467 U.S. 479 (*Trombetta*) and *Arizona v. Youngblood* (1988) 488 U.S. 51 (*Youngblood*). Defendant argued that his constitutional rights were violated because the video from Officer Galdamez's body camera was destroyed in bad faith. The motion was supported by documents that Motorola automatically purged the video and photos on the officer's body camera after expiration of the 90-day pilot program.

### *Evidentiary hearing*

At an evidentiary hearing on both motions, Officer Tramel testified that he took defendant into custody and placed him in handcuffs. Tramel did not advise defendant of

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

the *Miranda* warnings. He asked for defendant's name and he responded. As they waited for a patrol car to pick them up, defendant asked Tramel if he would let his girlfriend get his car. Tramel searched defendant but did not find any car keys, and asked defendant where the keys were. Defendant nodded his head toward Ms. Sellers's residence and said, " 'I think I dropped my phone and keys when jumping the fence.' "

Officer Moore testified that he spoke to defendant when he was sitting in a patrol car, after he had been arrested and placed in handcuffs. Moore advised defendant of the *Miranda* warnings. Defendant said he understood his rights. Moore asked defendant why he was in the area, and defendant answered questions. Moore testified Officer Galdamez recorded the interview on his body camera.

### The court's ruling

The court held defendant was in custody when Officer Tramel spoke with him, but his initial statements to Tramel were spontaneous and admissible, when he asked if Tramel would let his girlfriend get his car.

The court found Officer Tramel did not intentionally violate *Miranda* when he asked defendant about the location of the keys, because it was partially in response to his question about letting his girlfriend pick up the car. The court excluded defendant's response, however, that he nodded toward Ms. Sellers's house and said he thought he dropped the keys when he jumped the fence, because it was given in response to a question that was reasonably likely to elicit an incriminating response under the circumstances of defendant's presence in the backyard and flight. The court also held defendant's response to Tramel's question was not involuntary or coerced and would be admissible to impeach him if he testified at trial.

6.

The court further held defendant's subsequent statements to Officer Moore were not obtained in violation of *Miranda*, defendant was properly advised and stated he understood his rights, and he gave an implied waiver by answering questions.[2]

Finally, the court denied defendant's motion to dismiss based on *Trombetta* and *Youngblood*. The court held the failure to preserve the body camera photos and video was not intentional or done in bad faith by law enforcement. The court found it was entirely reasonable the officers did not realize that the body camera evidence was going to be automatically purged upon the completion of the pilot program. The court further stated the jury could consider the failure to preserve the evidence if the jury thought it was relevant to evaluate the credibility of the witnesses or strength of the prosecution's evidence.[3]

---

[2] "[A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights." (*Oregon v. Elstad* (1985) 470 U.S. 298, 314; *People v. Storm* (2002) 28 Cal.4th 1007, 1030–1031.) The court properly admitted defendant's statements to Officer Moore since his initial statements to Officer Tramel were not coerced or involuntary.

[3] The state must preserve evidence "expected to play a significant role in the suspect's defense. To meet this standard … [citation], evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*Trombetta, supra,* 467 U.S. 479, 488–489, fn. omitted.) In *Youngblood, supra,* 488 U.S. at p. 58, the court clarified that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Defendant failed to present any evidence of bad faith on the part of the police, or knowledge that the video and photographic evidence were going to be automatically purged by a third-party vendor.

## Verdict and sentence

On January 17, 2020, the jury found defendant guilty of attempted residential burglary (§§ 664, 460, subd. (a)) as a lesser included offense for count 1 and found true the allegation that a person other than an accomplice was present (§ 667.5, subd. (c)(21)).

The jury was unable to reach verdicts on the misdemeanor counts 2 and 3, and the court declared a mistrial on those charges.

On March 2, 2020, the court denied probation and sentenced defendant to the upper term of three years for count 1, attempted residential burglary. The court dismissed the violent felony allegation because, while it had been properly alleged for the charged offense of first degree residential burglary, it was legally inapplicable to the lesser included offense and conviction of attempted burglary. The court granted the prosecutor's motion to dismiss counts 2 and 3.

The court imposed a $300 restitution fine (§ 1202.4, subd. (b)) and suspended the parole revocation fine of $300 (§ 1202.45); it ordered victim restitution in an amount to be determined (§ 1202.4, subd. (f)). It also imposed a $10 crime prevention fee (§ 1202.5), a $40 court security fee (§ 1465.8), and a $30 criminal conviction fee (Gov. Code, § 70373).

On the same day, defendant timely filed a notice of appeal.

## Appellate motion

On November 11, 2020, appellate counsel sent a letter to the trial court pursuant to section 1237.2, and stated the court erroneously imposed the crime prevention fine pursuant to section 1202.5, that fine did not apply to a conviction for attempted residential burglary, and requested the court strike the fine and correct the record.

On November 17, 2020, the court granted defendant's motion, ordered the section 1202.5 fine stricken, and issued an amended abstract of judgment omitting the section 1202.5 fine.

8.

## DISCUSSION

As noted above, defendant's counsel has filed a *Wende* brief with this court. The brief also includes the declaration of appellate counsel indicating that defendant was advised he could file his own brief with this court. By letter on November 25, 2020, we invited defendant to submit additional briefing. To date, he has not done so.

After independent review of the record, we find that no reasonably arguable factual or legal issues exist.

## DISPOSITION

The judgment is affirmed.